UNITED STATES of America, Plaintiff,

v.

Charlein MATTHEWS, Defendant.

Crim. No. 79–0–104.

United States District Court,
D. Nebraska.

April 1, 1980.

Edward G. Warin, U. S. Atty., Omaha, Neb., for plaintiff.

Richard J. Dinsmore, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

The defendant, Charlein Matthews, is charged in a six-count indictment with the embezzlement of two Omaha-area banks, the North Side Bank and the Mid City Bank, in violation of 18 U.S.C. § 656. This matter is presently before the Court on the defendant's motion to suppress any testimony relating to statements made by the defendant to agents of the Federal Bureau of Investigation on three separate occasions. The defendant alleges that these statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the Fifth and Sixth Amendments of the Constitution. An evidentiary hearing on these issues was held on January 7 and 8, 1980.

From the evidence presented at the pretrial hearing, it appears that in late January, 1979, the F.B.I. received a complaint from officials at the North Side Bank, Omaha, Nebraska, regarding the disappearance of some funds from a teller's station operated by the defendant while she was employed by the bank. Following an interview with bank officials in April, 1979, the F.B.I. focused its investigation on the defendant. In early August of 1979, Special Agent Simmons of the F.B.I. telephoned the defendant and arranged to interview the defendant at her home on August 3, 1979.

On August 3, 1979, Agent Simmons, accompanied by another agent, interviewed the defendant at her home. This is the first interview challenged by the defendant.

At this interview, Agent Simmons explained to the defendant that he was investigating the disappearance of some funds from the North Side Bank and that he would like to question her since the teller's station at which she had worked was involved. The defendant denied any involvement, and the agents then served on the defendant a subpoena for handwriting and fingerprint exemplars, telling the defendant that the exemplars would be compared against any prints or writing found on the checks and other items involved in the embezzlement. On cross-examination, Agent Simmons acknowledged that at the time of the August 3 interview the items involved in the embezzlement had not been checked for fingerprints, and that when the items were subsequently examined no fingerprints were found. The defendant admitted at this interview no involvement in the embezzlement and indicated that she would like to discuss the matter with her husband, who was not present. Agent Simmons arranged to phone the defendant the following week to schedule another interview.

On August 7, 1979, Agent Simmons phoned the defendant and agreed to meet with the defendant and her husband that evening at the defendant's home. Accompanied by another agent, Agent Simmons arrived at the defendant's home at 7:35 p. m., where he was met by the defendant and her husband. Agent Simmons testified that, after he outlined the case to the defendant's husband, the defendant inquired as to the various options that were available to her. In response to the defendant's question, Agent Simmons testified that he discussed with the defendant all of the options that occurred to him at the time, such as the possibility of an indictment, guilty or not guilty plea, pretrial diversion, and trial. Concerning pretrial diversion, Agent Simmons testified that he explained the program to the defendant and emphasized that the F.B.I.'s role in that matter was to act as a fact-gathering agent, and that the ultimate decision regarding pretrial diversion was made by a committee in the United States Attorney's office. According to Agent Simmons' testimony, no promises

were made regarding pretrial diversion to the defendant.

The defendant and her husband testified that at this interview much of the time was spent discussing the pretrial diversion program, that Agent Simmons went into great detail relating another case in which a woman received pretrial diversion, and that the agents told the defendant that her chances of receiving pretrial diversion were one thousand to one in her favor. Although the F.B.I. was then investigating only the incidents involving the North Side Bank, the defendant testified that, after the discussion concerning the pretrial diversion program, she inquired whether she could still be considered for pretrial diversion if she had been involved in any other incidents, and told the agents that on one occasion she had also taken funds from the Mid City Bank when employed there. Both the defendant and her husband also testified that the agents told the defendant that she was free to retain an attorney but that an attorney would be an added expense and could hurt the defendant's chances for pretrial diversion, since time was of the essence.

On cross-examination, Agent Simmons testified that he had related to the defendant a recent case in which a young woman had been granted a pretrial diversion, and also that, with regard to the pretrial diversion program, he had told the defendant that it was in her favor that she had no prior convictions, was married, had children, and owned a home. Agent Simmons denied, however, making any promises or quoting any odds. As to any conversation regarding legal representation for the defendant, Agent Simmons testified that very little was said about the subject, and that he did not discourage the defendant from retaining an attorney, but told the defendant that that was a decision she herself would have to make.

Approximately forty-five minutes after the agents arrived at the defendant's home, the defendant agreed to make an oral statement to the agents about her involvement in the embezzlement. After the oral state-

ment was given, the agents advised the defendant of her rights, and the defendant signed a standard Advice of Rights form. The agents then took a written statement from the defendant which she signed. In the written statement, the defendant admitted that on three separate occasions she had taken funds from the North Side Bank, and that on one occasion she had taken funds from the Mid City Bank while employed there.

On September 14, 1979, the United States Attorney's office determined not to grant the defendant a pretrial diversion. Agent Simmons testified that, within a few days after learning of the decision, he informed the defendant by phone of the determination. The defendant testified that she was not notified of the United States Attorney's decision until she was invited by Agent Simmons to speak with him at the F.B.I. office on October 16, 1979.

Agent Simmons also testified that some time after September 14, 1979, he received a call from Mid City Bank advising him that other funds were missing that had been in the custody of the defendant while she was employed at that bank. It was this call from Mid City Bank concerning additional missing funds, Agent Simmons testified, which prompted him to call the defendant and arrange for a third interview.

On October 16, 1979, the defendant met with Agent Simmons at the F.B.I. offices. Agent Simmons testified that when the defendant arrived at the office, he told her that additional funds had been reported missing at Mid City Bank, again informed her that she would not be granted a pretrial diversion, and asked her for a statement regarding the additional funds. As mentioned above, the defendant testified that this was the first time that she had learned that pretrial diversion was no longer an option for her. The defendant also testified that, since the F.B.I. already had incriminating statements from her, she felt that she had little to lose by giving another statement, and so agreed to talk about the additional funds missing from Mid City Bank. The defendant was again given Miranda

warnings, and signed an Advice of Rights form and a written statement admitting that she had taken the additional funds missing from Mid City Bank.

The defendant was indicted on November 15, 1979, and charged with six counts of embezzlement in violation of 18 U.S.C. § 656. The first four counts of the indictment relate to the August 7, 1979, statement and involve three incidents at North Side Bank and one at Mid City Bank. The last two counts of the indictment relate to the October 16, 1979, statement, and involve two other incidents at the Mid City Bank. On December 21, 1979, the defendant filed this motion to suppress all testimony relating to any statements made at the August 3, August 7, or October 16, 1979, interviews. The defendant alleges that these statements were obtained in violation of the Miranda decision and the Fifth and Sixth Amendments of the Constitution.

I.

With regard to the applicability of Miranda warnings to the interviews in question, the Supreme Court has held that Miranda warnings are required only when a defendant is subjected to "custodial interrogation." Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

In Mathiason, a state police officer had requested a burglary suspect to meet him at the state patrol office "to discuss something." At the state patrol office, the officer told the suspect that he was not under arrest, that he wanted to talk to the suspect about a burglary, and that the suspect's truthfulness would possibly be considered by the district attorney or judge. Also, the officer falsely advised the defendant that his fingerprints were found at the scene. Within a few minutes, the defendant admitted that he had taken the property in ques-

tion. The officer then advised the defendant of his *Miranda* rights and tape recorded a confession. Following the confession, the officer told the defendant that he was not under arrest but that the case would be referred to the district attorney, who would decide whether criminal charges should be brought. Under these circumstances, the Supreme Court found that the suspect was not in custody, or otherwise deprived of his freedom of action in any significant way, and that *Miranda* warnings were, therefore, not required. The Supreme Court reasoned as follows:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

■ From the facts as developed in the pretrial hearing in the instant case, it is evident, particularly in light of *Mathiason*, that in none of the challenged interviews could the defendant be viewed as in custody or otherwise deprived of her freedom of action in a significant way. Since the Court finds that the defendant was not in custody or otherwise deprived of her freedom, *Miranda* warnings were not required to be given in any of the interviews.[1]

## II.

Although the Court holds that *Miranda* warnings were not required because each of the challenged interviews was noncustodial, it must still be determined whether the statements given by the defendant were involuntary so as to constitute an independent violation of the defendant's Fifth Amendment privilege against compulsory self-incrimination. As stated in *Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976):

> We recognize, of course, that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where "the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . . ." *Rogers v. Richmond*, 365 U.S. 534, 544 [, 81 S.Ct. 735, 741, 5 L.Ed.2d 760] (1961). When such a claim is raised, it is the duty of an appellate court, including this Court, "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Davis v. North Carolina*, 384 U.S. 737, 741–742 [, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895] (1966). Proof that

---

1. The defendant has emphasized in her argument that by the time of the first interview on August 3, 1979, she was the focus of the F.B.I.'s investigation. The Supreme Court, however, appears to have rejected a "focus test" for *Miranda* purposes. *See Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). In *Beckwith*, the Court emphasized that it was the compulsive aspect of in-custody interrogation, and not the strength of the government's suspicions at the time of questioning, which necessitated the prophylactic rules of *Miranda*. *Id.* at 346–47, 96 S.Ct. at 1616. *See also United States v. Jimenez*, 602 F.2d 139, 145 n. 7 (7 Cir. 1979). Thus, in the instant case, the fact that the defendant was the focus of the F.B.I.'s investigation does not alter the conclusion that *Miranda* warnings were not required.

some kind of warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive. *Frazier v. Cupp,* 394 U.S. 731, 739 [, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684] (1969); *Davis v. North Carolina, supra,* at 740–741 [, 86 S.Ct. at 1764].

■ The question of voluntariness, as often repeated, turns on the totality of the circumstances. *Boulden v. Holman,* 394 U.S. 478, 480, 89 S.Ct. 1138, 1140, 22 L.Ed.2d 433 (1969). And the burden is on the prosecution to prove by a preponderance of the evidence that a confession was voluntary. *United States v. Little Bear,* 583 F.2d 411, 413 (8th Cir. 1978); *United States v. Haskins,* 536 F.2d 775, 778 (8th Cir. 1976), *cert. denied,* 429 U.S. 898, 97 S.Ct. 263, 50 L.Ed.2d 182 (1976).

■ With regard to the first interview challenged by the defendant, which occurred at the defendant's home on August 3, 1979, it is not alleged that any promises or threats were made. Instead, the defendant has drawn the Court's attention primarily to the subpoena for fingerprints and handwriting exemplars served on the defendant at this interview, Agent Simmons failure to inform the defendant that the items involved in the embezzlement had not, as of then, been checked for fingerprints, and the fact that, when the items were subsequently checked, no fingerprints were found. It is not clear how the above, although largely undisputed, would render involuntary the statements made by the defendant at this interview. Nor has the Court been directed to any case law which suggests that, before questioning a suspect, the government is obligated to reveal all the evidence that it does or does not have. In any event, the Court finds that the conduct of the F.B.I. agents at the August 3 interview was not such as to overbear the defendant's will and that the statements made by the defendant at this interview were voluntary.

As to the second interview, which occurred at the defendant's home with her husband present on August 7, 1979, the question is much closer. The defendant's testimony, supported by her husband's, is that the F.B.I. agents impliedly promised her a pretrial diversion in exchange for a statement, and that the agents discouraged her from contacting an attorney. The F.B.I. agents' testimony is that no promises, express or implied, were made to the defendant and that, although the defendant's right to counsel was not much discussed, the agents did not discourage the defendant from seeking an attorney.

■ Relevant circumstances regarding the August 7 interview include the fact that the interview took place in the defendant's home, and that the defendant's husband was present. Of particular importance is the time interval between the August 3 and August 7 interviews, which allowed the defendant to discuss the matter with anyone she chose in advance of the second interview. The Court has also considered, however, that neither the defendant nor her husband had previously been subject to police interrogation or involved in a criminal prosecution. Although the defendant did sign an Advice of Rights form before assenting to the written statement taken at this interview, and such warnings are relevant to the issue of coercion, it appears that, immediately prior to the written statement, an oral statement was obtained from the defendant which was not preceded by any warnings.[2]

2. The fact that warnings were given before the written statement would, therefore, be entitled to little weight, since the defendant had already incriminated herself. If the oral statement were found to be involuntary, then the written statement in this instance would have to be excluded as "fruit of the poisonous tree." Once a confession has been illegally obtained from a defendant, the prosecution must demonstrate that any subsequent confession was not in fact obtained by exploiting the primary illegality, or that any causal connection had become so attenuated that the taint was dissipated. *Sanders v. Rowe,* 460 F.Supp. 1128, 1137 (N.D.Ill.1978). *See also Tanner v. Vincent,* 541 F.2d 932, 934–37 (2d Cir. 1976); *United States v. Toral,* 536 F.2d 893, 896–97 (9th Cir. 1976); and *United States v. Massey,* 437 F.Supp. 843, 857 -59 (M.D.Fla.1977). Under the circumstances of the instant case, it seems beyond

■ The most critical determination in this instance, of course, is whether the F.B.I. agents did in fact overreach the defendant, either by leading the defendant to believe that a pretrial diversion would be granted in exchange for her statement, or by discouraging the defendant from exercising her right to legal counsel. The evidence on this issue is conflicting, but the Court credits the testimony of the F.B.I. agents, and finds as a fact that no promises, express or implied, were made to the defendant, and that the defendant was not discouraged by the agents from seeking legal advice. Under all the circumstances, therefore, the Court finds that the conduct of the F.B.I. agents at the August 7 interview was not such as to overbear the will of the defendant, and that the statements given by the defendant at this interview were voluntary.

■ With regard to the third interview, which took place at the F.B.I. offices on October 16, 1979, the only objection raised by the defendant is that the statement taken in that interview was the product of the allegedly inadmissible statements taken in the prior interview on August 7, 1979. Since the Court finds that the August 7 statements were made voluntarily, it follows that the October 16, 1979, statement need not be excluded as "fruit of the poisonous tree." Even had the Court found the August 7 statements to have been illegally obtained, however, the extended period of time between the August 7 and October 16 statements would have been sufficient to attenuate the causal connection between the statements and to dissipate any taint. As stated in *United States v. Toral*,

536 F.2d 893, 896 (9th Cir. 1976), "[e]ven though a prior involuntary confession irretrievably 'lets the cat out of the bag,' a subsequent confession may still be made voluntarily under the proper circumstances." [3]

In the instant case, over two months had elapsed between the second and the third interviews, and during this time the defendant was not in custody, and was free to consult with an attorney at any time. The evidence also establishes that, at least by the time of the October 16 statement, the defendant was aware that pretrial diversion was no longer an option available to her.[4] Under these circumstances, the Court finds that the statement given by the defendant at the October 16 interview was voluntary and need not be excluded as fruit of a prior illegal confession.

### III.

■ Although the defendant may have had a Fifth Amendment right to counsel, with regard to a Sixth Amendment right to counsel, the Supreme Court has indicated clearly only that the Sixth Amendment is applicable at or after the time that judicial proceedings have been initiated against the defendant. *See Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). Whether the Sixth Amendment can attach prior to the initiation of judicial proceedings, such as upon the arrest of the suspect, has been the subject of some dispute. *Sanders v. Rowe*, 460 F.Supp. 1128, 1138 n. 28 (N.D.Ill.1978). Until either a suspect has been arrested, or judicial proceedings initiated, however, it has been held that the Sixth Amendment right to counsel

---

dispute that the written statement taken at this interview was the direct product of the oral statement and that, even though an Advice of Rights form had been signed in the interim by the defendant, the causal connection between the written statement and the oral statement had not become attenuated.

**3.** *See* note 2, *supra*, for a discussion of this issue in a different context.

**4.** The defendant testified that she first learned she would not be granted a pretrial diversion at the October 16 interview itself. Agent Simmons testified that he informed the defendant of the decision shortly after September 14, the date on which the decision not to grant a diversion was made. In either event, the defendant was aware that pretrial diversion was no longer an option before she gave a statement to the F.B.I. at the October 16 interview.

does not attach. *United States v. Nashawaty*, 571 F.2d 71, 74–75 (1st Cir. 1978).[5]

In the instant case, the defendant was not arrested before being indicted, and was not indicted until November 15, 1979. Hence, since all of the interviews here challenged were conducted prior to indictment or arrest, a Sixth Amendment right to counsel was not applicable.

In sum, the Court finds that the statements made by the defendant to agents of the F.B.I. during interviews on August 3, August 7 and October 16, 1979, were voluntary and not obtained in violation of the *Miranda* decision, nor the Fifth and Sixth Amendments of the Constitution. A separate order denying defendant's motion to suppress any testimony relating to these statements has previously been entered in conformity with this memorandum opinion.

**5.** As noted by the court in *Nashawaty, supra*, 571 F.2d at 75, the Supreme Court in *Hoffa v. United States*, 385 U.S. 293, 309–10, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966), has also ruled that the Sixth Amendment does not attach merely upon the accumulation of sufficient evidence by the government to arrest a suspect. As stated in *Hoffa*, "[t]he police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long." *Hoffa, supra*, 385 U.S. at 310, 87 S.Ct. at 417.