**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Vincent Anthony PERDUE, Defendant–Appellant.**

No. 92–3140.

United States Court of Appeals, Tenth Circuit.

Nov. 1, 1993.

---

**10.** *But see supra* note 8.

Lee Thompson, U.S. Atty., Thomas G. Luedke, Asst. U.S. Atty., Topeka, KS, for plaintiff-appellee.

Benjamin C. Wood, Lawrence, KS, for defendant-appellant.

Before McKAY, Chief Judge, SETH and BRORBY, Circuit Judges.

McKAY, Chief Judge.

Mr. Vincent Perdue appeals his conviction in federal district court for possession of marijuana with intent to distribute, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and use of a firearm in relation to a drug trafficking offense, 18 U.S.C. § 924(c)(1). Mr. Perdue alleges that two confessions, one made just prior to his arrest and another made after his arrest,

were erroneously admitted into evidence. Mr. Perdue further contends that the district court erred in instructing the jury and that insufficient evidence existed to support his firearms conviction.

State and local law enforcement officers executed a search warrant at a rural location in Jefferson County, Kansas, after aerial surveillance indicated that marijuana was being cultivated on the property. The property was thought to be owned by Robert or Gary Lathron. (R.Vol. II at 11.) Two helicopters and fifteen to twenty law enforcement officers were involved in the search. Inside a metal building on the property, police found roughly 500 marijuana plants, weighing scales, containers and plastic bags with marijuana, and other paraphernalia. Inside the bedroom of the building, police found a loaded 9 mm. pistol lying on the bed and an unloaded 12–gauge shotgun with shotgun shells nearby.

Jefferson County Deputy Sheriff Carreno and Kansas Highway Patrolman Tate were assigned to perimeter security during the search. Through radio communications, the two officers became aware that weapons were found in the building. While the police were conducting the search, a car entered the long dirt road leading to the property. At a fork in the road, the car turned right toward the metal building being searched. Officers Carreno and Tate became suspicious because it was a remote, rural area and anyone using the road was probably visiting the property being searched. After proceeding a short distance down the road, the occupants of the car observed the large gathering of police officers surrounding the shed. The car quickly stopped and reversed its direction. With weapons drawn, Officers Carreno and Tate stopped the car and ordered Mr. Perdue and his fiancee to get out of the car and lie face down. Mr. Perdue obliged but his fiancee could not, because she was nearly nine months pregnant. Although the record is unclear, Mr. Perdue may have been handcuffed while lying on the ground.[1]

---

1. Although it is clear Mr. Perdue was handcuffed, the district court made no finding as to when it happened. According to Mr. Perdue's and his fiancee's testimony, Mr. Perdue was handcuffed while he was on the ground, prior to questioning. Deputy Carreno testified on direct

Officer Carreno testified that, with guns still drawn and Mr. Perdue lying face down on the road, he asked Mr. Perdue what he was doing on the property and Mr. Perdue replied that he was there to check on his stuff. Officer Carreno then asked Mr. Perdue "What stuff?" and Mr. Perdue replied, "The marijuana that I know that you guys found in the shed." Officer Carreno further inquired whose marijuana it was, and Mr. Perdue replied it was his and his fiancee's.[2] (R.Vol. III at 154.)

Immediately following this encounter, the police escorted Mr. Perdue a short distance to where they encountered an Agent Christy. Deputy Carreno informed Agent Christy that Mr. Perdue was the owner of the building and had come to check on its contents. At this point, Officer Carreno advised Mr. Perdue of his *Miranda* rights.

Agent Christy conducted the next segment of the interrogation, which lasted from forty-five minutes to an hour. During the course of the interview, Mr. Perdue was asked questions regarding the marijuana and drug para-phernalia found on the premises. Mr. Perdue made incriminating statements regarding the possession and distribution of marijuana. His fiancee, crying and visibly upset, was present during the interview. Sometime during the interview, Agent Christy was joined by a Jefferson County Attorney. Mr. Perdue testified that the Jefferson County Attorney told him that if he did not cooperate he would be charged in federal rather than state court, and thus would spend more time in jail. (R.Vol. V at 30.) The attorney told Mr. Perdue that this would interfere with the bonding between him and his child. *Id.* The County Attorney also told Mr. Perdue that if he cooperated, his fiancee would not go to jail.[3] *Id.* After about forty-five minutes of questioning, Mr. Perdue began to exercise his right to remain silent in response to particular questions, and then abruptly terminated the conversation. (R.Vol. V at 8–11.)

Prior to trial, the district court held a hearing on Mr. Perdue's motion to suppress his statements to Agent Christy (*i.e.,* the

---

examination that Mr. Perdue was handcuffed after he was arrested. Yet, upon cross-examination, Deputy Carreno's responses indicated Mr. Perdue may have been handcuffed while on the ground, before being questioned. Cross-examination of Deputy Carreno went as follows:

Q. And the next thing you did after you got them down on the ground was to approach? After you got [Mr. Perdue] down on the ground by ordering him down, you approached him?
A. That's correct.
Q. You made physical contact with him?
A. Yes.
Q. Okay. You put handcuffs on him?
A. Yeah. He ended up having the handcuffs put on him.
Q. And he didn't resist you placing handcuffs on him?
A. No.
Q. And was it while he was lying face down that you asked him questions?
A. Yes.

(R.Vol. III at 158.) There is also conflicting testimony regarding what happened when Mr. Perdue got out of the car. Mr. Perdue's fiancee testified that Mr. Perdue was thrown to the ground and an officer placed his knee on Mr. Perdue's neck. (R.Vol. V at 23.) Deputy Carreno testified that Mr. Perdue lay face down when asked to do so. (R.Vol. III at 157.)

2. It is unclear whether Officer Carreno's gun was pointed directly at Mr. Perdue during the ques-tioning. The district court found that the suspects were "detained at gunpoint," but did not specify whether the suspects remained at gunpoint after Mr. Perdue was forced to the ground. At trial, Officer Carreno testified that both he and Officer Tate kept their guns drawn throughout the encounter. (R.Vol. III at 156–160.) Although Officer Carreno admitted that both of the officer's guns were fixed on Mr. Perdue for most of the detention, Officer Carreno testified that his own gun was not directly aimed at Mr. Perdue during the period when the questioning occurred. Although he could not say where his gun was pointed, Officer Carreno was sure that it remained in a position where he could quickly use it on Mr. Perdue if he needed to do so. (R.Vol. III at 158–159.) Officer Carreno also testified that at the time of the interrogation he was standing above Mr. Perdue (less than two feet away) while Mr. Perdue lay face down in the dirt. (R.Vol. III at 158.)

3. Again, there is some discrepancy in the testimony. The government argued that the statements by the county attorney came near the end of the questioning (R.Vol. V at 13, 20), while Mr. Perdue says the statements occurred at the beginning of the interrogation. (R.Vol. V at 30–31.) Additionally, Agent Christy testified that the government merely "explained" the difference between state and federal drug prosecutions and sentences and the importance of a father being with a child during the earliest periods of the child's life.

statements made after Mr. Perdue's arrest and subsequent receipt of *Miranda* warnings). Mr. Perdue argued that his statements were coerced by the government agents' promises to prosecute Mr. Perdue in state rather than federal court and not to prosecute Mr. Perdue's fiancee.

The district court denied the motion to suppress, holding that the statements were voluntary. However, the admissibility of the statements made to Officer Carreno during the initial road stop was not raised at the pretrial hearing because defense counsel was unaware of the statements' existence. The government first advised defense counsel of the statements during trial. After holding a bench conference, the district court found the statements to Officer Carreno were also admissible. The two statements by Mr. Perdue were admitted into evidence, and the jury returned guilty verdicts on both counts.

After trial, Mr. Perdue moved for a judgment of acquittal on the firearms charge, notwithstanding the verdict. The district court denied the motion, finding substantial evidence to support the jury's verdict. (D.Ct. Memorandum & Order at 3.) Mr. Perdue also moved for a new trial alleging that the court erred in admitting the statements to Officer Carreno and in instructing the jury. The district court denied the motion for a new trial, finding that the defendant's arrival at the scene during the search "created reasonable suspicion" that warranted stopping and questioning Mr. Perdue under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Id.* at 5, 88 S.Ct. at 1871. The court alternatively found that if the admission of the statements was erroneous, it was harmless error. Mr. Perdue's allegation concerning the jury instructions was deemed to be without merit.

Mr. Perdue appeals, alleging that (1) the district court erred in admitting the statements to Deputy Carreno and Agent Christy; (2) the district court gave an erroneous jury instruction; and (3) evidence was insufficient to sustain the firearms charge.

## I.

## ADMISSIBILITY OF STATEMENT TO OFFICER CARRENO AT ROAD STOP

We first address Mr. Perdue's contention that the district court erred by admitting into evidence his statements to Officer Carreno. Mr. Perdue bases his argument on four grounds: (1) the government withheld evidence of the statement in violation of discovery obligations; (2) the statements were taken in violation of *Miranda;* (3) the statements were involuntary; and (4) there was not a proper hearing on the statements' admissibility in violation of due process.

### A. Discovery Violation

■ We begin with Mr. Perdue's contention that the government violated the discovery order. The flaw in this argument is that there is no evidence in the record that Mr. Perdue requested discovery of evidence pertaining to his incriminating statements. Therefore, Fed.R.Crim.P. 16(a)(1)(A), which requires the government to disclose information "[u]pon request," was not violated.[4]

■ Mr. Perdue further contends that the government indicated it was conducting a "full discovery" case and, therefore, the government was obligated to release information concerning the statement. (R.Vol. I, tab 32 at 1.) Under the circumstances, we do not find this a compelling reason to exclude Mr. Perdue's statements.

By the phrase "full discovery," Mr. Perdue presumably means that the government informed defense counsel that it would divulge case evidence within its control. If the government tells the defense it is conducting a case under principles of "full discovery," it undertakes a moral obligation to disclose relevant evidence within its knowledge so as not to lull defense counsel into not making a discovery motion. While the government may have been careless in this case, there is

---

4. Arguably, Fed.R.Crim.P. 16(a)(1)(A) could be interpreted as requiring government disclosure of the substance of an oral statement made in response to interrogation "if the government in-tends to use that statement at trial," even if the defendant does not request disclosure. We need not address this interpretation, however, since Mr. Perdue does not raise the issue.

no indication that it acted in bad faith by failing to advise defense counsel of the statement.

The government was not aware of Mr. Perdue's brief statements to Officer Carreno until the day Officer Carreno testified. The government did, however, warn Mr. Perdue of the incriminating statements prior to Officer Carreno's testimony, and if Mr. Perdue needed more time to prepare an argument for excluding the statements, he should have sought a continuance. Moreover, the existence of the incriminating statements was effectively communicated to Mr. Perdue during the suppression hearing where Agent Christy twice testified that he learned of Mr. Perdue's interest in the contents of the building from a conversation between Mr. Perdue and Officer Carreno. (R.Vol. V at 6, 17.) This provided Mr. Perdue with notice that statements to Officer Carreno existed, and if Mr. Perdue desired more information he should have sought a discovery order. Thus, even though the government apparently told Mr. Perdue that this was a "full discovery" case, we see no reason to exclude the statements under these circumstances.

Finally, the government's failure to expressly disclose the evidence of Mr. Perdue's incriminating statements on its own initiative does not violate Mr. Perdue's right to due process. Due process requires a prosecutor "to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). This is not a concern here because the evidence withheld was not "favorable" to Mr. Perdue in the sense that it was neither impeachment nor exculpatory evidence. *See Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380.

### B. Constitutional Issues

Mr. Perdue also asserts that his statements to Officer Carreno during the road stop were involuntary in violation of his due process rights and were not proceeded by the procedural safeguards required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government counters that Officer Carreno obtained the statements during a valid Fourth Amendment seizure of Mr. Perdue as authorized by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district court concluded that since Mr. Perdue was interrogated by Officer Carreno during a valid *Terry* stop, the statements were voluntary and *Miranda* warnings were not required. We disagree.

In relying on Fourth Amendment doctrine to determine whether Mr. Perdue's confession was voluntary and whether he should have been advised of his *Miranda* rights, the district court merged several distinct constitutional inquiries into one. The district court's confusion is understandable because this case presents unique questions concerning the subtle interplay between *Terry, Miranda,* and due process. Accordingly, we now examine each of these constitutional doctrines individually in turn.

### 1. *Terry* and the Fourth Amendment

The Fourth Amendment protects a person's right to be secure against unreasonable seizure. In order to protect that right, formal arrests or seizures that resemble formal arrests must be supported by probable cause. *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981). Recognizing that police officers must often act before probable cause can be determined, however, the Supreme Court adopted an intermediate approach in *Terry.* The Supreme Court held that a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. While *Terry* stops are seizures under the Fourth Amendment, they "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause...." *Summers,* 452 U.S. at 699, 101 S.Ct. at 2592.

■ *Terry* stops must be limited in scope to the justification for the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Officers may ask the detained individual questions during the *Terry* stop in order to dispel or confirm their suspicions, *id.* at 498, 103 S.Ct. at 1324; *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975), "[b]ut the detainee is not obliged to respond." *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). Since police officers should not be required to take unnecessary risks in performing their duties, they are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop." *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985); *see Terry*, 392 U.S. at 23–24, 88 S.Ct. at 1881. An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent. *See Brignoni–Ponce*, 422 U.S. at 881–82, 95 S.Ct. at 2580.

■ Under the Fourth Amendment, the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances. *See Terry*, 392 U.S. at 19, 88 S.Ct. at 1878. Reasonableness is determined by balancing the governmental interest in crime prevention against the citizen's right to be free from governmental intrusion. *Id.* at 20–21, 88 S.Ct. at 1879. The government has the burden of demonstrating "that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 500, 103 S.Ct. at 1326. The ultimate legal determination of reasonableness under the Fourth Amendment is subject to de novo review. *United States v. Corral*, 970 F.2d 719, 723 (10th Cir.1992).

The government concedes that probable cause did not exist to arrest Mr. Perdue when he was initially detained; therefore, the Fourth Amendment analysis is limited to whether the stop was a valid seizure under *Terry*.

■ We agree with the district court and the government that the officers had an objectively reasonable basis to suspect that Mr. Perdue was involved in criminal activity. Since the property is rural and set back from the road, anyone driving up the lane to the building containing the contraband was justifiably suspect. Thus, Mr. Perdue's mere arrival at the property being searched was a suspicious circumstance. When the car suddenly turned around and attempted to leave after its passengers came into view of the police activity surrounding the shed, the officers had an articulable, reasonable basis for making the stop and investigating further. This is not, however, the end of a *Terry* analysis. Although the seizure was reasonable at its inception, we must determine whether it was reasonable as conducted. *Terry*, 392 U.S. at 27–28, 88 S.Ct. at 1883.

■ It was not unreasonable under the circumstances for the officers to execute the *Terry* stop with their weapons drawn. While *Terry* stops generally must be fairly nonintrusive, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures. "[T]he use of guns in connection with a stop is permissible where the police reasonably believe [the weapons] are necessary for their protection." *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir.1982), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983). Similarly, other circuits have held that police officers may draw their weapons without transforming an otherwise valid *Terry* stop into an arrest. *See, e.g., United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir.1990), *cert. denied*, 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991); *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir.1988); *United States v. Serna–Barreto*, 842 F.2d 965, 968 (7th Cir.1988); *United States v. Jones*, 759 F.2d 633, 638 (8th Cir.), *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985); *United States v. Jackson*, 652 F.2d 244, 249 (2d Cir.), *cert. denied*, 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981).

In the present case, the officers were justified in displaying some force. The officers knew that guns were found on the property where marijuana was being cultivated. This fact alone justifies any concern the officers had for their personal safety.[5] Although effectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an "arrest" in most scenarios, it was not unreasonable under these circumstances.

We believe that the officers were also justified in ordering Mr. Perdue out of the car and onto the ground as a means of neutralizing the potential danger. *See Merritt,* 695 F.2d at 1273; *Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). Directing the suspect to lie on the ground provided the officers with a better view of the suspect and prevented him from obtaining weapons which might have been in the car or on his person. As discussed earlier, the officers had reason to be concerned for their safety and thus could take reasonable steps to protect themselves.

This holding is consistent with the recent trend allowing police to use handcuffs or place suspects on the ground during a *Terry* stop. Nine courts of appeals, including the Tenth Circuit, have determined that such intrusive precautionary measures do not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment. *See, e.g., United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir.1993) (display of firearms and use of handcuffs); *United States v. Smith,* 3 F.3d 1088 (7th Cir.1993) (handcuffs); *United States v. Saffeels,* 982 F.2d 1199, 1206 (8th Cir.1992) (handcuffs), *cert. granted, judgment vacated,* —— U.S. ——, 114 S.Ct. 41, 126 L.Ed.2d 12 (1993) vacated on other grounds); *United States v. Williams,* No. 91–3097, 1992 WL 308584 at *2 (D.C.Cir. Oct. 6, 1992) (unpublished opinion); *United States v. Esieke,* 940 F.2d 29, 36 (2d Cir.) (handcuffs and leg irons), *cert. denied,* —— U.S. ——, 112 S.Ct. 610, 116 L.Ed.2d 632 (1991); *United States v. Crittendon,* 883 F.2d 326, 329 (4th Cir.1989) (handcuffs); *United States v.*

*Hemphill,* 767 F.2d 922 (6th Cir.) (Table) (Available on WESTLAW at 1985 WL 13433 and on LEXIS) (requiring suspects to lie on ground in handcuffs), *cert. denied,* 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 340 (1985); *United States v. Kapperman,* 764 F.2d 786, 790 n. 4 (11th Cir.1985) (placing suspect in police car in handcuffs); *United States v. Taylor,* 716 F.2d 701, 709 (9th Cir.1983) (making suspect lie on ground in handcuffs).

In short, the officers conducted a reasonable *Terry* stop. Although bordering on an illegal arrest, the precautionary measures of force employed by the officers were reasonable under the circumstances. The Fourth Amendment does not require that officers unnecessarily risk their lives when encountering a suspect whom they reasonably believe to be armed and dangerous.

**2. *Miranda* and Its Interplay with *Terry***

*Miranda* requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Thus two requirements must be met before *Miranda* is applicable; the suspect must be in "custody," and the questioning must meet the legal definition of "interrogation."

The Supreme Court has instructed that a person has been taken into police custody whenever he "has been deprived of his freedom of action in any significant way." *Id.,* 384 U.S. at 444, 86 S.Ct. at 1612. The Court has also stated that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curium). The only relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *United States v. Berkemer,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). The *Berkemer* opinion indicates that a suspect can be placed in

---

**5.** "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

police "custody" for purposes of *Miranda* before he has been "arrested" in the Fourth Amendment sense. *Berkemer*, 468 U.S. at 441, 104 S.Ct. at 3151. *See also United States v. Smith*, 3 F.3d at 1097 (7th Cir.1993) ("*Berkemer* thus underscores that Fifth and Sixth Amendment rights are implicated before a defendant has been arrested.").

The second requirement is that the suspect must have been subjected to "interrogation." The Court has explained that interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted).

The traditional view, consistent with the district court's conclusion, is that *Miranda* warnings are simply not implicated in the context of a valid *Terry* stop. *United States v. Streifel*, 781 F.2d 953, 958 (1st Cir.1986) ("As a general rule, *Terry* stops do not implicate the requirements of *Miranda*. . . ."); *United States v. McGauley*, 786 F.2d 888, 891 (8th Cir.1986) (no *Miranda* warning necessary for persons detained for a *Terry* stop); *United States v. Jones*, 543 F.2d 1171 (5th Cir.1976), *cert. denied*, 430 U.S. 957, 97 S.Ct. 1604, 51 L.Ed.2d 807 (1977); *United States v. Hickman*, 523 F.2d 323 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976). This view has prevailed because the typical police-citizen encounter envisioned by the Court in *Terry* usually involves no more than a very brief detention without the aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda*." *Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3149.

Thus, historically, the maximum level of force permissible in a standard *Terry* stop fell short of placing the suspect in "custody" for purposes of triggering *Miranda*. This fact led the Court to announce in *Berkemer*, "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions

that *Terry* stops are subject to the dictates of *Miranda*." *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150.

The last decade, however, has witnessed a multifaceted expansion of *Terry*. Important for our purposes is the trend granting officers greater latitude in using force in order to "neutralize" potentially dangerous suspects during an investigatory detention. As discussed in our Fourth Amendment analysis, when circumstances reasonably indicate that the suspects are armed and dangerous, courts have been willing to rely on the "officer safety" rationale of *Terry* and authorize the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons, and other measures of force more traditionally associated with the concepts of "custody" and "arrest" than with "brief investigatory detention." Thus, today, consonant with this trend, we held that police officers acted reasonably under the Fourth Amendment when they, without probable cause and with guns drawn, stopped Mr. Perdue's car, forced him to get out of his car, and demanded that he lie face down on the ground.

■■■ One cannot ignore the conclusion, however, that by employing an amount of force that reached the boundary line between a permissible *Terry* stop and an unconstitutional arrest, the officers created the "custodial" situation envisioned by *Miranda* and its progeny. Mr. Perdue was forced out of his car and onto the ground at gunpoint. He was then questioned by two police officers while police helicopters hovered above. During the questioning, Mr. Perdue remained face down on the ground while the officers kept their guns drawn on him and his pregnant fiancee. The record indicates that physical force and handcuffs may also have been used in the initial detention. Regardless of whether handcuffs and physical force were actually employed, Mr. Perdue's freedom of action was curtailed in a "significant way." *Berkemer*, 468 U.S. at 435, 104 S.Ct. at 3148.

Furthermore, the use of guns to force a suspect off the road, out of his car, and onto the ground is a type of police conduct more "associated with formal arrest," *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517,

3520, 77 L.Ed.2d 1275 (1983), than with the characteristically "noncoercive" and "non-threatening" *Terry* stop. *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150. Indeed, the force used against Mr. Perdue would have constituted an arrest were it not for the fact that the officers had knowledge that Mr. Perdue could be armed and dangerous.

As noted *supra*, *Berkemer* instructs that the "only relevant inquiry [when determining if a suspect is in 'custody'] is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151. A reasonable man in Mr. Perdue's position could not have misunderstood the fact that if he did not immediately cooperate, his life would be in danger. Any reasonable person in Mr. Perdue's position would have felt "completely at the mercy of the police." *Berkemer*, 468 U.S. at 438, 104 S.Ct. at 3149. We therefore find as a matter of law that Mr. Perdue was in police custody during the initial questioning by Officer Carreno.

■ Next, we must determine if Officer Carreno's questions were "interrogation." To do so we must ask whether the questions were "reasonably likely to illicit an incriminating response." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689. The government admits that the officers asked the questions in order to confirm or dispel their suspicions about the marijuana. Given the fact that Mr. Perdue was entering a piece of property that was primarily used to grow marijuana, the initial question, "What are you doing here?," was reasonably likely to illicit an incriminating response. When Mr. Perdue answered, "To check on my stuff," the questions that immediately followed, "What stuff?," and "Who does the marijuana belong to?" are the essence of interrogation. Therefore, the officers should have informed Mr. Perdue of his constitutional rights after "neutralizing" him but before commencing with the interrogation. Their failure to do so constitutes a violation of *Miranda*.

■ Police officers must make a choice—if they are going to take highly intrusive steps to protect themselves from danger, they must similarly provide protection to their suspects by advising them of their constitutional rights.

Our holding today is consistent with the Supreme Court's opinion in *Berkemer* and is in line with a growing number of courts which have recognized that *Miranda* rights can be implicated during a valid *Terry* stop. *See, e.g., United States v. Smith*, 3 F.3d 1088 .(7th Cir.1993) (holding that *Miranda* warnings were necessary during a *Terry* stop that became "custodial" because of the use of handcuffs); *United States v. Elias*, 832 F.2d 24 (3d Cir.1987); and *United States v. Bautista*, 684 F.2d 1286, 1291 (9th Cir.1982) ("*Miranda* warnings are necessary even during a *Terry* stop if the suspect has been taken into custody or if the questioning otherwise takes place in a police dominated or compelling atmosphere."), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *see also* Richard A. Williamson, *The Virtues (and Limits) of Shared Values: The Fourth Amendment and Miranda's Concept of Custody*, 1993 U.Ill.L.Rev. 379, 409 (1993) (arguing that *Berkemer* should be interpreted to require *Miranda* warnings in some highly intrusive *Terry* situations).

In *Berkemer*, the United States Supreme Court held that *Miranda* warnings are not required during a routine traffic stop. Analogizing the traffic stop to a standard *Terry* stop, the Court held that suspects are typically not in "custody" for purposes of *Miranda* during such a "nonthreatening" encounter. In response to the respondent's assertions that the Court's holding would allow police to execute *Terry*-type stops with their weapons drawn and without administering *Miranda* warnings, the Court stated, "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protection prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150. The Court explicitly refused to adopt a bright-line rule proffered by the government which would have made *Miranda* inapplicable in all police-citizen encounters that do not rise to the level of a Fourth Amendment arrest. *Id.* at 441, 104 S.Ct. at 3151.

The *Berkemer* Court described the circumstances surrounding a routine traffic stop that make such a detention fall short of "custody" for purposes of *Miranda*. Two facts were of particular importance to the Court. First, the "detention of a motorist pursuant to a traffic stop is presumptively temporary and brief.... A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." *Id.* at 437, 104 S.Ct. at 3149. Second, the circumstances of a routine stop are not such that a motorist feels at the mercy of the police. Most traffic stops are conducted in public. "Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Id.* at 438, 104 S.Ct. at 3149.

Neither of these circumstances are present in this case. The *Terry* stop occurred in an isolated, rural area not subject to the public's scrutiny. The stop was obviously not for a routine traffic matter such as a speeding ticket. The officers forced the car to stop with their guns and then questioned the suspect with weapons drawn. We believe this case presents the precise scenario envisioned by the *Berkemer* Court when it indicated that *Miranda* warnings might be implicated in certain highly intrusive, "non-arrest" encounters. We therefore hold that Mr. Perdue's incriminating statements to Officer Carreno were admitted at trial in violation of *Miranda*.

### 3. Voluntariness and Due Process

■ Mr. Perdue also contends that his statements to Officer Carreno were involun-

tary, in contravention of his due process rights under the Fourteenth and Fifth Amendments. Again, the district court found that the statements were voluntary because they were elicited during a valid *Terry* stop. The ultimate determination of whether a confession is voluntary is a question of law reviewable by this court de novo. *Griffin v. Strong*, 983 F.2d 1540, 1541 (10th Cir.1993).

The voluntariness of a confession is determined by considering the totality of the circumstances in which it was made. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). To determine voluntariness, we must ask:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

■ A number of factors must be considered in assessing whether a confession is voluntary. These factors include the age, intelligence, and education of the suspect; the length of the detention and questioning; the use or threat of physical punishment; whether *Miranda* safeguards were administered; the accused's physical and mental characteristics; and the location of the interrogation. *United States v. Chalan*, 812 F.2d 1302, 1307–1308 (10th Cir.1987). The court must also consider the conduct of the police officers. *See Mincey v. Arizona*, 437 U.S. 385, 398–402, 98 S.Ct. 2408, 2416–18, 57 L.Ed.2d 290 (1978).

■ Construing the facts in a way most favorable to the government, we hold as a matter of law that Mr. Perdue's statements were made involuntarily.[6] No single factor dictates this result; rather, we are led to this

---

**6.** To construe the facts in a way most favorable to the government, we must assume three things: 1) the officers ordered Mr. Perdue to the ground at gunpoint without physically touching him; 2) handcuffs were not placed on Mr. Perdue until

after the initial interrogation; and 3) Officer Carreno was standing above Mr. Perdue with his gun drawn during the interrogation rather than on top of him with his knee in Mr. Perdue's neck.

conclusion because of the overwhelmingly coercive atmosphere created by many different elements. Of particular importance are the isolated location in which the interrogation took place, the rapidity with which the events unfolded, the officers' use of guns, the placement of the suspect face down in the dirt prior to interrogation, the fact that Officer Carreno stood above Mr. Perdue with his gun drawn during the questioning, and the failure to provide *Miranda* safeguards. Also contributing to the coercive, "police dominated" environment was the large and intimidating presence of police officers, vehicles, and helicopters which the suspects observed when first entering the property.

The government argues that the officers were justified in using force during the stop because the situation was tense, unfolding rapidly, and the officers feared life-threatening hostility. Unlike the officers, Mr. Perdue was unarmed and taken totally by surprise. It is not hard to believe Mr. Perdue's assertions that the situation was extremely tense and frightening from his perspective also. The fact that Officer Carreno may have momentarily pointed his gun away from Mr. Perdue during the questioning did not lessen the coercive nature of the interview. While lying face down on the dirt road with Officer Carreno above him, Mr. Perdue would have been unable to appreciate this modest change in circumstance.

The government, while apparently conceding that the atmosphere was coercive, argues that Mr. Perdue's statements were voluntary because he is an intelligent person and has had *Miranda* rights read to him on a prior occasion. We find this argument unpersuasive. Mr. Perdue did not have much time to ponder over past life experiences. The atmosphere was clearly not conducive to reflective thought.

 Finally, the government argues that the use of force was necessary to secure the safety of the officers. We agree. However, if police officers choose to use forceful methods to detain a suspect for investigation, they must back off before interrogating him. The officers in this case should have secured their own safety by either frisking Mr. Perdue and removing any weapons, placing him in the nearby police cruiser, or temporarily placing him in handcuffs. Then, the officers should have holstered their guns and advised Mr. Perdue of his *Miranda* rights. Questioning pursuant to *Terry* should not have commenced until the officers dispelled the coercive atmosphere or otherwise made clear to Mr. Perdue that he would not be physically harmed if he did not cooperate with the officers. Their failure to do so under these circumstances rendered Mr. Perdue's confession involuntary in violation of the Fifth and Fourteenth Amendments.

### C. Improper Hearing on Admissibility

Mr. Perdue contends the statement made to Officer Carreno during the road stop should have been excluded because there was no hearing as to its admissibility. In light of our holding on Mr. Perdue's statement to Officer Carreno, we need not address this issue.

### II.

### ADMISSIBILITY OF STATEMENT TO AGENT CHRISTY

 Given that the initial confrontation between Mr. Perdue and Officer Carreno produced an involuntary confession, the appropriate inquiry in determining the admissibility of Mr. Perdue's subsequent statements to Agent Christy is whether the "coercion surrounding the first statement had been sufficiently dissipated so as to make the second statement voluntary." *Leon v. Wainwright,* 734 F.2d 770, 772–73 (11th Cir.1984) (citing *Darwin v. Connecticut,* 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968), and *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954)). The government must show intervening circumstances which indicate that the second confession was "insulate[d] ... from the effect of all that went before." *Clewis v. Texas,* 386 U.S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423 (1967). The later confession will be admissible while the first confession will not "only if such a distinction is justified by a sufficiently isolat-

ing break in the stream of events." *Leon,* 734 F.2d at 772.[7]

■ A review of the record indicates that the tense and coercive atmosphere that accompanied the initial constitutional violation pervaded the second phase of the interrogation as well. The second interrogation occurred only minutes after the initial encounter with Officer Carreno.[8] After being ordered out of his car and onto the ground at gunpoint, and then being illegally interrogated, Mr. Perdue was handcuffed and escorted on foot only a short distance. At this point, he was interrogated by Agent Christy while surrounded by several other officers including Officer Carreno. Fifteen to twenty law enforcement officials were present in the immediate area, and helicopters were hovering overhead. Mr. Perdue's pregnant fiancee was present, crying and visibly upset. At some point, the officers "explained" to Mr. Perdue the differences in state and federal drug penalties and the possibility that he would be separated from his child. All of this occurred in an isolated area, outside of the view of passersby. Given the immediacy of the second phase of the interrogation and the surrounding circumstances, no intervening cause readily appears to demonstrate that this later phase was insulated from the shock and coercion that marked the initial encounter.

The fact that the police advised Mr. Perdue of his *Miranda* rights prior to the second round of interrogation is not dispositive in light of the fact that Mr. Perdue had already "let the cat out of the bag" just minutes before in the face of life-threatening police pressure. *See United States v. Toral,* 536 F.2d 893, 896 (9th Cir.1976); *see also* *United States v. Matthews,* 488 F.Supp. 374, 379 n. 2 (D.Neb.1980) ("The fact that [Miranda] warnings were given before [the second confession] would, therefore, be entitled to little weight, since the defendant had already incriminated herself."). Likewise, the switch of interrogating officers from Officer Carreno to Agent Christy did not break the chain of events. Officer Carreno's constant and immediate presence during the second phase, along with the intimidating presence of fifteen to twenty other officers, mitigated any insulating effect this change might have otherwise produced.

■ The government argues that, because Mr. Perdue began to exercise his right to remain silent after about forty-five minutes had passed and ultimately terminated the interrogation, he had knowledge of his constitutional rights and was comfortable asserting those rights at any time. We find this argument unpersuasive. Mr. Perdue's eleventh-hour exercise of his constitutional rights more readily indicates that he did not feel comfortable invoking those rights until enough time had passed to allow him to collect his thoughts, shake off the effects of the initial coercion, and realize that, although he had already made incriminating statements, continuing to talk would not help his situation. In other words, Mr. Perdue's eventual termination is more probative of the fact that when the second phase of interrogation began, the effects of the initial encounter were not yet dissipated, and did not completely dissipate until forty-five minutes had passed.

In short, the temporal proximity of the confession to the initial violation, the addition of new pressures, and the absence of any

---

7. We note that *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), is not relevant for our determination on this issue. In *Elstad,* the Supreme Court held that the "fruit of the poisonous tree" doctrine does not apply to confessions obtained after an initial confession that was voluntary but not preceded by *Miranda* warnings. In this case, there was not only a violation of *Miranda,* but the initial confession was involuntary in violation of due process. Therefore, *Elstad* does not control.

8. When dealing with the admissibility of a confession that followed an illegal confession, the

length of time that passed between the two has played an important role in determining whether the second confession was an involuntary product of the first. Courts have found twenty-four hours, two days, and four days not enough time to insulate the effect of an illegally obtained confession. *See Griffin v. Strong,* 983 F.2d 1540 (10th Cir.1993) (effects of compelled confession felt two days later); *United States v. Lee,* 699 F.2d 466 (9th Cir.1982) (twenty-four hours not enough); *United States v. Matthews,* 488 F.Supp. 374 (D.Neb.1980) (four days not enough time to dissipate effects of first confession).

meaningful intervening circumstances compel us to conclude that the confessions to Agent Christy should not have been admitted at trial. We find as a matter of law that Mr. Perdue's statements to Agent Christy were involuntary products of Officer Carreno's forceful tactics during the first stage of the encounter and the overwhelmingly coercive atmosphere that pervaded the entire interrogation.

## III.

## HARMLESS ERROR

Having reached the conclusion that the district court erred in admitting Mr. Perdue's incriminating statement to Officer Carreno and in allowing into evidence the second confession to Agent Christy, we must now apply a harmless error analysis to determine whether the use of Mr. Perdue's statements requires reversal. We hold that it does.

 Constitutional errors during trial do not necessarily require reversal of a conviction. The Supreme Court "has applied harmless error analysis to a wide range of ... constitutional errors," including the admission of unlawful confessions. *Arizona v. Fulminante*, 499 U.S. 279, 306–07, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991).

 In conducting harmless error analysis, we review the record de novo. *Fulminante*, 499 U.S. at 295–96, 111 S.Ct. at 1257; *United States v. de Francisco–Lopez*, 939 F.2d 1405, 1412 (10th Cir.1991). For us to hold that a federal constitutional error was harmless, we "must be able to declare a belief that it was harmless beyond a reasonable doubt."[9] *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *see Fulminante*, 499 U.S. at 295–96, 111 S.Ct. at 1257. Thus we must decide, beyond a reasonable doubt, that Mr. Perdue's confessions to Officer Carreno and to

Agent Christy did not contribute to his conviction. *Yates v. Evatt*, —— U.S. ——, ——, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991) (citing *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828). "To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates*, —— U.S. at ——, 111 S.Ct. at 1893.

 We cannot find beyond any reasonable doubt that if the confessions to Officer Carreno and Agent Christy had been excluded, the jury would have reached the same verdict.

A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind, even if told to do so." *Fulminante*, 499 U.S. at 296, 111 S.Ct. at 1257 (quoting *Bruton v. United States*, 391 U.S. 123, 139–40, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J. dissenting)). Moreover, the confessions were the only direct evidence of Mr. Perdue's possession and distribution of marijuana. While the jury was also given indirect evidence to consider,[10] we cannot conclude beyond a reasonable doubt that the confessions did not "contribute to the verdict" or that they were "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Yates*, —— U.S. at ——, 111 S.Ct. at 1893.

## IV.

## JURY INSTRUCTION

Mr. Perdue also asserts that the district court "gave an erroneous instruction on reasonable doubt which violated [his] right to

---

9. We note that the standard for constitutional harmless error, applicable in this case, is different from the nonconstitutional harmless error standard. *See United States v. Rivera*, 900 F.2d 1462, 1469–70 (10th Cir.1990).

10. Physical evidence found on the property indicated it was Mr. Perdue's residence. School

books with Mr. Perdue's name written on them, his motorcycle, and other personal property were found at the site. Additionally, the jury might have considered Mr. Perdue's visit to the site during the search as additional evidence that he possessed the marijuana on the property.

due process of law." (Appellant's Br. at 11.) In light of our holding on Mr. Perdue's statement to Officer Carreno and Agent Christy, we need not address this issue.

## V.

### SUFFICIENCY OF THE EVIDENCE

Mr. Perdue's final contention is that the evidence was insufficient to find him guilty of using a firearm in relation to a drug trafficking offense under 18 U.S.C. § 924(c)(1) (1988). Under the circumstances of this case, our reversal of Mr. Perdue's conviction on the drug trafficking offense necessitates the reversal of this conviction as well. *See United States v. Nicholson,* 983 F.2d 983, 990 (10th Cir.1993) (conviction under § 924(c) requires government to prove that defendant committed underlying offense, that defendant used or carried the weapon, and that the use or carriage was during or in relation to a drug trafficking offense). However, while we do not feel that the admission of the confessions was harmless error beyond a reasonable doubt, we cannot say that there was such a deficiency in the evidence that no jury could have convicted Mr. Perdue without the aid of his confessions. Thus, it is necessary to remand for a new trial without the admission of Mr. Perdue's confessions into evidence.

In summary, we REVERSE and REMAND for a new trial. The statements to Officer Carreno and Agent Christy were improperly admitted into evidence, and we do not believe beyond a reasonable doubt that this error was harmless. Furthermore, this reversal necessitates the reversal on the conviction for the use of a firearm in a drug trafficking offense. Given our disposition, we do not reach the issue of the jury instruction on reasonable doubt.