HARTZ, Circuit Judge,
concurring in part and dissenting in part:
I concur in the affirmance of the summary judgment in favor of Layton City. I also agree that we must set aside the summary judgment in favor of Officer King on Mr. Olsen’s Fourth Amendment excessive-force claim. I respectfully dissent, however, from the majority’s view that Olsen is entitled to pursue his Eighth Amendment/Due Process claim against King and Davis County. I will first address the Fourth Amendment claim and then the Eighth Amendment claim. (To be precise, both claims are under the Fourteenth Amendment, which imposes on the states the substance of the Fourth and Eighth Amendments. See Cooper Indus. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433-34, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (Eighth Amendment is incorporated into Fourteenth Amendment); Wolf v. Colorado, 338 U.S. 25, 27-28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (incorporating Fourth Amendment into Fourteenth Amendment).)
I. Fourth Amendment Claim
I agree that Mr. Olsen’s testimony raises a genuine issue of material fact regard *1321 ing whether Officer King used excessive force during Olsen’s detention. If the jury believes Olsen’s account of being thrown against the store window, despite his having offered no resistance to King, it could reasonably find that King violated Olsen’s Fourth Amendment rights by using excessive force.
The majority opinion, however, appears to go further in finding additional possible Fourth Amendment violations by King. To the extent that it does, I disagree. Because I am not sure precisely what is the majority opinion’s view of the pertinent law, I shall set forth my own analysis, without attempting to compare it to the majority’s.
The starting point is to determine what legal basis, if any, King had to detain Olsen. The core charge against Olsen was fraudulent use of a credit card under Utah Code Ann. § 76-6-506.2. The statute makes it a crime for a person “knowingly, with intent to defraud, [to] obtain or attempt to obtain eredit[,] or purchase or attempt to purchase goods, property, or services, by the use of a false, fictitious, altered, counterfeit, revoked, expired, stolen, or fraudulently obtained financial transaction card.” (emphasis added.) Because the statute prohibits a mere attempt, it does not matter whether Olsen actually obtained any merchandise or eventually paid for any merchandise that was obtained.
In my view, King had probable cause to arrest Olsen for the credit card offense when the mall security guard informed him of what had happened when Olsen tried to use the credit card. After all, Olsen had attempted to buy merchandise with a card that Discover Card had reported to be fraudulent. (In fact, he had attempted to use the Discover Card immediately after his Visa Card had been rejected. The rejection may have resulted from an error by the store clerk in entering the card’s expiration date, but this error was not known at the time. Cf. United States v. Shareef, 100 F.3d 1491, 1505 (10th Cir.1996) (“A mistaken premise can furnish grounds for a Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] stop, if the officers do not know that it is mistaken and are reasonable in acting upon it.” (internal quotation marks omitted)).)
Even though the information received by King was double hearsay, an officer can rely on such information if each level of hearsay was itself reliable. See United States v. McCoy, 478 F.2d 176, 179 (10th Cir.1973). Here, both levels of hearsay were reliable. The initial report was by the store clerk, an identified citizen with no apparent axe to grind. See United States v. Neff, 300 F.3d 1217, 1221 (10th Cir.2002) (discussing presumptive reliability of citizen informants). And the security officer was herself a reliable source. See Gramenos v. Jewel Cos., 797 F.2d 432, 439 (7th Cir.1986) (“Police have reasonable grounds to believe a guard at a supermarket.”). Not only did the security officer have no apparent reason to lie, she had a strong motive to be restrained in accusing a customer of crime — both because of her employer’s desire to keep customers and because of the potential liability to the security officer and her employer if the store’s detention of the customer was unfounded. See id.
Of course, it is good police practice to ask the suspect for an explanation of apparently criminal conduct. But the arresting officer has no obligation to believe the suspect, see Romero v. Fay, 45 F.3d 1472, 1474 (10th Cir.1995) (officer lawfully kept suspect in custody despite suspect’s protestations of innocence), and failure to inquire does not void the officer’s probable cause, see id. at 1477-78 (once officer had *1322 probable cause to arrest, his failure to investigate further did not negate probable cause finding, absent showing that initial determination was itself unreasonable); See generally Wayne R. LaFave et al., 2 Search and Seizure § 3.2(d) at 47-49 (2d ed.1996).
If I am correct that King had probable cause to arrest Olsen upon receiving the security officer’s report, then King could lawfully handcuff Olsen and take him to the store clerk for further investigation. The sole possible Fourth Amendment violation (although hardly a trivial one) would be the use of excessive force in throwing Olsen against the store window.
Yet even if I am incorrect about the existence of probable cause, the report from the security officer unquestionably gave King reasonable suspicion to detain Olsen for further investigation. We thus may examine the constitutionality of King’s conduct on the assumption that he lacked probable cause but had reasonable suspicion. In this regard, it is important to recognize that it is irrelevant whether King thought he had probable cause to arrest or whether he thought he was effecting an arrest. The issue is whether King had sufficient information to justify what he did with the suspect. As a leading authority states:
The police conduct should be judged in terms of what was done rather than what the officer involved may have called it at the time. If an officer tells the suspect he is under arrest but then conducts only a frisk and finds a weapon, a later determination that grounds for arrest were lacking should not render inadmissible the discovered weapon if there were in fact grounds for a stop and the frisk. Obviously the result would be otherwise if the search exceeded that permissible under Terry.
Wayne R. LaFave et al., 2 Criminal Procedure § 3.8(b) (2d ed.1999); see Maryland v. Macon, 472 U.S. 463, 470-71, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (“Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer’s actions in light of the facts and circumstances confronting him at the time, and not on the officer’s actual state of mind at the time the challenged action was taken.”) (internal citation and quotation marks omitted); Neff, 300 F.3d at 1222 (“In measuring the actions of a police officer under the Fourth Amendment, ... we look at the objective facts, not the officer’s state of mind.”). But cf. George Dix, Nonarrest, Investigatory Detention in Search and Seizure Law, 1985 Duke L.J. 849, 922 (1985) (whether officer announces that suspect is under arrest may be relevant to “the intrusiveness experienced by a detainee”).
Given reasonable suspicion to believe Olsen had committed a crime, King had the right to detain Olsen for a reasonable time to investigate the matter. It was appropriate for King to follow up on the security officer’s report by questioning the store clerk and calling Discover Card, and it was certainly lawful for King to continue to detain Olsen during this limited period of time.
Of course, King could not employ excessive force during the detention. If a jury believed Olsen’s account, it could properly find that King violated Olsen’s Fourth Amendment rights by throwing him against a store window.
In addition, if King had only reasonable suspicion, but not probable cause, then the use of handcuffs may have constituted excessive force for the investigative detention. The use of handcuffs is not a per se violation of the rights of a person being detained for investigation based on reasonable suspicion. Neff, 300 F.3d at 1220 *1323 (“[A] Terry stop does not become unreasonable just because police officers use handcuffs_”). Nevertheless, unlike when there is probable cause for an arrest, there must be justification for their use, such as specific reason to fear violence or escape. See id. at 1220-21.
If the handcuffing of Olsen was improper in this ease, he would have a cause of action under the Fourth Amendment for such use of excessive force. That violation, however, would not vitiate the lawfulness of extending the investigative detention to enable King to interview the store clerk and call Discover Card. (The handcuffing could also affect the lawfulness of any interrogation of Olsen, but that is not an issue before us.)[1] Once King had interviewed the store clerk and called Discover Card, he unquestionably had probable cause to arrest Olsen.
In short, the only potential grounds I can see for a Fourth Amendment claim here are (1) the use of excessive force in throwing Olsen against the store window (which is a proper claim whether there was probable cause for an arrest or only reasonable suspicion for an investigative detention); and (2) the use of excessive force in handcuffing Olsen (if there was not probable cause for an arrest (contrary to my view) and there was no specific justification for the use of handcuffs).
II. Eighth Amendment Claim
I agree that Mr. Olsen’s Eighth Amendment claims against Layton City must fail. Contrary to the majority opinion, however, I would also affirm the summary judgment in favor of Officer King and Davis County on the Eighth Amendment claims against them. This is not a reflection on the seriousness of Olsen’s medical condition. The record indicates that his OCD has caused him great suffering. Yet even viewing the evidence in the light most favorable to his claim, he has not produced sufficient evidence that the defendants violated the Eighth Amendment.
I begin with King. The sole basis for Olsen’s Eighth Amendment claim against King arises out of King’s driving Olsen to jail. According to Olsen, twice during the trip he told King that he was having a panic attack. ■ He does not claim that he told King he suffered from OCD. He does not claim that he told King he needed medical attention. He does not claim that *1324 he told King he needed to take his medication. Indeed, although Olsen’s briefs on appeal assert that King should have provided treatment for Olsen’s panic attack, they do not state specifically what King should have done differently.
The custodial drive to jail apparently caused Olsen to suffer. But “only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.” Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotation marks omitted). King could be hable only if he “kn[ew] of and disregarded] an excessive risk to [Olsen’s] health or safety,” id. at 837, 114 S.Ct. 1970, caused by his continuing to drive to jail rather than taking some other action (unidentified by Olsen on appeal) consistent with his duties as a police officer. The evidence simply does not support a finding that King had such culpable knowledge.
To assess the claim against Davis County, we look to what happened at the jail. Upon arrival at the Davis County Jail at 6:52 p.m., Olsen was brought into a pre-booking area, where he was asked a series of medical questions as part of a screening process. According to the screening sheet, he suffered from (1) diagnosed restlessness, (2) OCD (recorded incorrectly as “CDC”), (3) panic attack syndrome, (4) mild cardiovascular problems, (5) hypertension, and (6) a cold; and he had prescriptions for Biaxin and antihistamine. Olsen did not sign the authorization for medical examination and/or treatment while incarcerated, which appears at the bottom of the screening sheet.
Olsen testified that after the completion of the medical screening sheet, he was asked if he had anything in his pockets. He stated that he had two medications for OCD, Diazepam and Chlorpromazine. He took Diazepam once a day and had taken a pill before his arrest. He took Chlorpro-mazine twice a day but had not yet taken a pill that day. The jail officer told him that he had to turn over the medication.
While Olsen was still in the pre-booking area, the officers conducted a pat-down search. As part of the search, Olsen was asked to remove his belt, shirt, shoes, and socks. The officers inspect shoes and socks because they are common places to hide weapons. Olsen informed the officers that he did not want to take off his shoes and socks because he had OCD and was germophobic. According to Olsen, he was having a panic attack at this time, though his deposition testimony does not reveal whether he told the officers he was having a panic attack while he was being searched.
In the interest of their safety, the officers insisted that Olsen comply with their request that he take off his shoes and socks. Nevertheless, they provided him a chair to sit on so that his feet would not have to touch the floor. An officer testified that this was an accommodation, which made the search less safe because Olsen could more easily assault the officers from a seated position. After he took off his shoes and socks, the officers searched them, and gave Olsen his socks back. Olsen remained sock-footed for the remainder of his time in jail.
The officers then took Olsen into the booking area, where he was to check his possessions and be photographed and fingerprinted. While he was checking his possessions, Olsen told the officers that he had medicine for his OCD with him and that he needed it because he was having a panic attack. The officers, however, would not allow him to have the medicine, and they took it from him.
Olsen was then fingerprinted. Typically, before fingerprinting a prisoner, the officers ask the prisoner to wash his hands *1325 so that all oils and grease are removed, thereby ensuring a good quality print. Olsen protested. Again telling the officers that he was germophobic, he expressed his concern that there might be a lot of germs around the sink where he was to wash his hands. Contrary to their normal policy, the officers allowed Olsen to forego hand washing, and fingerprinted his unwashed hands. Additionally, although the officers ordinarily require prisoners to wash their hands after fingerprinting, they did not make Olsen do so.
After fingerprinting, Olsen was allowed into a day room where he placed phone calls and watched television. He was released on bail at 9:15 p.m., less than two- and-a-half hours after arriving at the jail.
Olsen asserts in his brief that he requested “medical attention” from the Davis County Sheriffs Department and that jail personnel denied his requests. But the only evidentiary support he provides for this assertion is a citation to a 60-page portion of his deposition testimony. Such an overbroad reference can be (and should be) disregarded by the court. See Gross v. Burggraf Const. Co, 53 F.3d 1531, 1546 (10th Cir.1995). In any event, the record does not support the assertion. At most, Olsen informed county officials that as a result of his OCD, (1) he could not do certain things — namely, take off his shoes or wash his hands, and (2) he needed his medication. He never testified that he asked for medical assistance.
The Davis County prisoner intake policy has several provisions regarding the medical needs of prisoners. The Admission Search Procedure contains the following directive:
A. Pre-booking Preparation....
3.... The intake floor receiving deputy will do the following:
a. A medical check will be made to insure the prisoner is not in need of immediate care....
App. 359. The section on Access to Treatment states:
To communicate to prisoners the availability of health services within the Davis County Jail and the method of obtaining the services[:]
Information about health care services will be communicated to all prisoners upon their arrival to jail. The instructions will be given verbally and/or written.
A. Access to treatment information -will include, but not be limited to:
1. Doctor’s sick call
2. Emergency medical care
3. Mental health needs
4. Dental clinic
B. This information will be communicated to each prisoner:
1. Verbally
a. At the time of intake screening
App. 361. Another provision addresses medication:
... Prisoners claiming to be on medication:
a. Obtain the following information:
1) Purpose of medication
2) Dosage
3) Description of medication
4) Name of physician prescribing
5) Date of prescription
6) Last dose
7) Pharmacy
b. The nurse will verify above information by calling:
1) Prescribing physician
2) Hospital
3) Family to obtain:
*1326 a) Prescription number, date, physician, name of medication.
b) Purpose of medication
App. 362. (Although this provision appears under the title, “Prisoners with communicable disease,” the parties apparently agree that it applies more generally.) Finally, the section entitled “Receiving Screening” twice deals with medical and psychiatric needs. First:
Intake screening will be performed on all prisoners presented for incarceration at the Davis County Jail. Screening prevents prisoners who pose a health or safety threat to themselves or others from being admitted to the facility’s general population.
Observation of inmates during the screening may prevent suicide, detect symptoms of drug withdrawals, recognize the signs of trauma the inmate may have received, and if he/she requires medical attention....
A. Receiving screening will be conducted during the initial booking process of the Davis County Jail and will be performed by medical staff and/or health trained correctional deputies. The screening will include:
1. Initial screening for emergency medical or psychiatric needs.
3. Documenting medical history
4. Documenting prisoner’s behavior and appearance.
B. Receiving screening will be documented on the medical screening form....
C. Prisoners posing immediate health or safety threats to themselves or others are treated as follows: [what follows is not in the record].
App. 363. Later it states:
2. It must be a matter of judgement weather [sic] or not to accept such a prisoner. Remember, however, that the screener cannot diagnose the condition, and it might be more serious than seems apparent. So when using judgment and common sense, it 'is determined the prisoner may have a problem, do not accept him until he has been medically cleared.
0. Prisoners exhibiting behavior indicative of psychiatric disorders or suicide threat (delusions, hallucinations, communication difficulties, speech and posturing, impaired level of consciousness, disorganization, memory defects, depression or evidence of self mutilations) will not be accepted without medical clearance.
App. 364.
From the above evidence, I do not see how an Eighth Amendment claim against Davis County can be sustained. Mr. Olsen fails on two grounds. First, the county is liable in damages only if an employee committed a constitutional violation. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); Myers v. Oklahoma County Bd. of County Comm’rs, 151 F.3d 1313, 1320 (10th Cir.1998). But, as I will explain below, there was no constitutional violation. Second, even if an employee committed such a violation, Olsen’s sole theory of county liability is that the county failed to train the jail employees to deal with prisoners suffering from OCD. Such failure-to-train liability can be imposed, however, only if the failure reflected the county’s “ ‘deliberate indifference’ to the rights of its inhabitants.” Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 *1327 (1989). Olsen has failed to provide evidence of such deliberate indifference. I will now address each ground in more detail.
To establish a constitutional violation, Olsen must show that at least one jail employee “kn[ew] of and disregarded an excessive risk to [Olsen’s] health or safety.” Farmer, 511 U.S. at 837, 114 S.Ct. 1970. (The requisite state of mind was referred to in Wilson v. Seiter, 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), as “deliberate indifference.” Use of that term, however, can cause confusion because the same term has a different meaning in the related context of municipal liability for constitutional violations by employees. As this court has explained: “In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official. In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it.” Barney v. Pulsipher, 143 F.3d 1299, 1307, n. 5 (1998) (emphasis added).) There is nothing in the record on appeal, however, to show that any staff member had the culpable state of mind required for an Eighth Amendment violation.
When Olsen complained about taking off his shoes and socks because of his fear of germs on the floor, jail personnel accommodated him by finding a chair so that his feet would not touch the ground. Although the officers could have accommodated Olsen further by not requiring him to remove his shoes and socks, there was a clear security purpose in checking those articles of clothing for such items as weapons or drugs. The Eighth Amendment does not require jails to forego reasonable security measures. Cf. Bell v. Wolfish, 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (“The fact of confinement as well as the legitimate goals and policies of the penal institution limits ... retained constitutional rights.”). Similarly, the officers accommodated Olsen in the fingerprinting process by not making him wash his hands. The Eighth Amendment did not mandate that the jail refrain from fingerprinting him.
A similar analysis applies to taking medication from Olsen. Jail procedures required medical personnel to verify any prescription needs before a prisoner could be given medication. This practice makes obvious sense. Otherwise, prisoners could take unlawful or dangerous drugs, and prisons could be held responsible for not preventing such self-destructive behavior. The problem here is that the verification procedure was not completed during Olsen’s incarceration of more than two hours. Such a delay in the context of this case may justify a finding of negligence by the county jail. But it is another matter altogether to find on this record that a county employee possessed the necessary culpable state of mind. The record is devoid of any evidence regarding the jail’s actions after Olsen’s Chlorpromazine was seized. One can only speculate regarding who was responsible for the delay and what that person’s state of mind was. In my view, the record would not support a jury finding that some jail employee “kn[ew] of and disregard[ed] an excessive risk to [Olsen’s] health or safety.” Farmer, 511 U.S. at 837, 114 S.Ct. 1970. Therefore, the summary judgment against Olsen on this claim must be sustained. See Revell v. Hoffman, 309 F.3d 1228, 1232 (10th Cir.2002) (stating standard for summary judgment).
Moreover, even if a jail employee violated Olsen’s rights under the Eighth Amendment, Olsen has not provided sufficient evidence to sustain his claim against Davis County. He asserts that OCD is so *1328 common that the county had an obligation to train jail personnel in how to handle prisoners suffering from the condition. The county intake policy, however, has provisions that would seem to respond reasonably to the medical needs of prisoners. To prevail against the county, Olsen must show that “ ‘the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need’ for additional training.” Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir.1996) (quoting Harris, 489 U.S. at 390, 109 S.Ct. 1197).
The question, then, is whether it was “obvious” that under the jail's policies, absent further training, jail personnel were likely to violate the Eighth Amendment rights of inmates with OCD by knowingly disregarding “excessive risk[s] to [their] health or safety.” Farmer, 511 U.S. at 837, 114 S.Ct. 1970. In my view, the record in this case does not establish such obviousness. Olsen’s evidence concerns only the prevalence of OCD in the general population. He presents no evidence regarding prison populations. In particular, he presents no evidence regarding how often OCD manifests itself in ways that require special attention in a prison setting, the experience of prisons in dealing with inmates suffering from this affliction, or whether special training of jail personnel is necessary to avoid serious harm. Olsen’s germophobia and severe reaction to jail conditions may, for all the record shows, be a rare occurrence among those who suffer from OCD.
In Allen v. Muskogee, 119 F.3d 837, 842 (10th Cir.1997), we said that “evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability.” Here, there is no evidence of such “recurring situations” in the Davis County jail.
We have also said that “[t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.” Barney, 143 F.3d at 1307 (emphasis added). I assume that “constructive notice” of a fact can arise when the fact is widely known by those in the particular field of endeavor. See Harris, 489 U.S. at 390 n. 10, 109 S.Ct. 1197 (police administrator’s need to train officers in use of deadly force is plainly obvious). In Allen itself the plaintiff had properly relied on an expert who testified that the municipality’s procedures were “out of synch with the rest of the police profession.” 119 F.3d at 844. If this is a proper interpretation of “constructive notice,” then Davis County could have constructive notice of an OCD problem (so that the problem is “obvious”) based on information from outside the experience of its own jail. The record before us, however, contains no evidence of “best practices” in other prisons with respect to treating persons with OCD, nor does it refer to literature on the subject directed to prison administrators or other law enforcement personnel.
All the record contains is medical literature. But a matter cannot be considered “obvious” to jail administrators simply because it is well known to medical professionals or families of those affected by a particular disorder. Prison officials do not have constructive notice of what appears in medical literature. Because Olsen relies only on medical literature, and provides no evidence regarding what was known by Davis County jail administrators or by jail *1329 administrators in general, or even what happens in jails in general, he has not established the obviousness required for liability of Davis County.
In sum, although there are disputed facts in the record, there are no disputed material facts that could justify setting aside the district court’s summary judgment on Olsen’s Eighth Amendment claims. I therefore respectfully dissent from the reinstatement of those claims against King and Davis County.

. I recognize that language in some of this court's opinions suggests that excessive use of force, such as the unnecessary use of handcuffs, converts an investigative detention into an arrest. Our first opinion so stating was United States v. Perdue, 8 F.3d 1455 (10th Cir.1993), in which we wrote, "[E]ffectuating a Terry stop by pointing guns at a suspect may elevate a seizure to an 'arrest' in most scenarios.” Id. at 1463. But a more precise statement of the proposition appeared earlier in the opinion, where we said, "An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.” Id. at 1462. In other words, to say that certain police conduct converts a stop into an arrest is only to say that the conduct could only be justified, if at all, by probable cause. Opinions that have followed Perdue have addressed only whether the use of excessive force rendered the detainee's statements or consent to search inadmissible. See, e.g., United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir.1994). The analysis in these opinions would be essentially the same if we had said simply that the officers had used excessive force in a Terry stop, rather than saying that the stop became an arrest. See, e.g., id. at 1055-56. Indeed, pri- or to Perdue, we had criticized the approach of some courts in deciding that the degree of force used by officers could convert a stop into an arrest. See United States v. Merritt, 695 F.2d 1263, 1274 (10th Cir.1982). In any event, none of the Perdue line of cases stands for the proposition that the continued detention of Olsen in itself became unlawful if excessive force was used.