**UNITED STATES of America, Plaintiff,**

v.

**Isidro Aranda FLORES, Defendant.**

**No. 2:02 CR 397 W.**

United States District Court, D. Utah, Central Division.

Jan. 23, 2004.

David F. Backman, Salt Lake City, UT, for plaintiff.

Sharon L. Preston, Salt Lake City, UT, for defendant.

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

WINDER, Senior District Judge.

This matter is before the court on Defendant's Motion to Suppress. On September 23, 2003, the court conducted an evidentiary hearing on the motion. Defendant Isidro Aranda Flores ("Aranda–Flores") was present with his counsel, Sharon L. Preston. The government was represented by David F. Backman. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. After thorough review and consideration of the pleadings submitted by the parties and the testimony presented at the evidentiary hearing on the motion to suppress, the court enters the following memorandum decision and order.

## BACKGROUND

The court finds the relevant facts as follows.[1] On June 16, 2002, the defendant was driving a car when he apparently fell asleep at the wheel, causing a head-on collision with an oncoming vehicle. (Tr. at 116–17.) The driver and sole occupant of the oncoming car, a nineteen year old United States citizen, was killed on impact. (Tr. at 12.) One passenger in the defendant's car was killed and the defendant and the remaining three passengers were injured. (Tr. at 11.) The defendant was transported to St. Mary's Hospital in Grand Junction, Colorado. (Tr. at 12.) The defendant suffered a broken leg which required surgical treatment.

On June 17, 2002, Kristine Schaufelberger, an agent with the Immigration Customs Enforcement (formerly the Immigration and Naturalization Service and referred to hereinafter as "Immigration"), was contacted by officers in Durango, Colorado. (Tr. at 10–11.) The officers told Agent Schaufelberger about the accident and explained that the driver of one car apparently fell asleep and crashed head-on into the other car. (Tr. at 11.) Agent Schaufelberger was informed that one of the people involved in the accident,

---

1. Reference to the transcript of the evidentiary hearing conducted on September 23, 2003, will be cited as "Tr. at ___."

later identified as the defendant, was an alien and was in the hospital in Grand Junction. (Tr. at 12, 18.) That same day, Agent Schaufelberger went to the hospital "to determine [the defendant's] immigration status in the country for administrative purposes" and to determine whether or not the defendant was subject to removal from the United States. (Tr. at 18.)

Upon arriving at the hospital, Agent Schaufelberger asked for permission to speak to the defendant. (Tr. at 13.) Agent Schaufelberger received permission from the nurses to talk to the defendant, and the nurses indicated that the defendant had also said he was "willing to talk." (Tr. at 13.) Agent Schaufelberger went to the defendant's hospital room. Prior to speaking to the defendant, Agent Schaufelberger asked a nurse in the defendant's room about the defendant's medical condition. (Tr. at 14.) The nurse advised that the defendant had a broken leg and a cut on his arm, but that he did not have any head injuries and that he was not on any medications that would impair his mind. (Tr. at 14–15.)

Agent Schaufelberger approached the defendant and attempted to communicate with him in English. The defendant indicated that he spoke Spanish and Agent Schaufelberger then conversed with him in Spanish.[2] (Tr. at 13.) Agent Schaufelberger asked the defendant about his condi-

tion and whether he was in pain. He indicated that he was "fine" and that it was just his leg that hurt. (Tr. at 15.) Agent Schaufelberger, who was not in uniform, introduced herself, explained that she was with Immigration, and asked the defendant if he was willing to speak with her. (Tr. at 13–15.) The defendant agreed to talk with her. (Tr. at 15.) Agent Schaufelberger testified that she would not have pursued the interview if the defendant had indicated he did not want to talk with her. (Tr. at 15.) There was no indication that the defendant did not understand or was mentally impaired in any manner. (Tr. at 15–18.)

Agent Schaufelberger's purpose for going to the hospital and meeting with the defendant was to determine whether the defendant was a deportable illegal alien and whether to take him into administrative custody upon his release from the hospital. (Tr. 19–20.) Agent Schaufelberger was not investigating the car accident. (Tr. at 18.) She did not ask questions about the accident or the possibility that the defendant may have been smuggling illegal aliens at the time of the accident. (Tr. at 18–20.)[3] Agent Schaufelberger testified that she did not give the defendant his *Miranda* rights because the defendant was not in custody and because Agent Schaufelberger was not focusing on the defendant as a target of a criminal investigation. (Tr. at 20.)

To determine whether he was subject to deportation, Agent Schaufelberger asked

2. Agent Schaufelberger testified that she speaks "excellent" Spanish. (Tr. at 8.) Most of the people she works with speak Spanish and she uses Spanish routinely in her Immigration responsibilities. (Tr. at 8.)

3. Agent Schaufelberger did ask the defendant about who was in the car with him at the time of the accident to determine whether he was with family members. (Tr. at 24–25.) The defendant said the passengers were just

friends from Mexico, but he did not know their names. For insurance purposes, and at the request of the hospital, Agent Schaufelberger also asked the defendant who owned the car he was in at the time of the accident. He said the car belonged to his uncle in Phoenix, Arizona, and that he believed his uncle had insurance. (Tr. at 25.)

the defendant for his biographical information. (Tr. at 20.) The defendant said he was a citizen of Mexico and that his father had applied to immigrate him some time ago. (Tr. at 20.) The defendant stated that he had never talked to an Immigration officer before and that he had never had an appointment with Immigration. (Tr. at 21.) The defendant said he entered the United States in 1997. He said he was not sure how he entered, but that he did not think he had the proper documents to enter. (Tr. at 22.) Among other things, the defendant told Agent Schaufelberger that he had been living in Michigan with some relatives, and he provided the names of siblings and other relatives in the United States. (Tr. at 24.) The defendant also gave Agent Schaufelberger his father's telephone number. After obtaining the defendant's biographical information, Agent Schaufelberger departed the hospital, still uncertain whether the defendant was an illegal alien subject to removal proceedings. (Tr. at 26.)

After leaving the hospital, Agent Schaufelberger used the information provided by the defendant to further investigate his legal status. She called the defendant's father who said he had applied for his son but never received an answer from Immigration. (Tr. at 22.) Agent Schaufelberger ran computer checks to determine the defendant's legal status in the United States and did not find any applications to legalize the defendant's status. (Tr. at 20–21.)

The next day, on June 18, 2002, Agent Schaufelberger returned to the hospital to see if the defendant would sign a form authorizing the hospital to inform Immigration upon his release and asking for permission to take his photograph. (Tr. at 26–28.) Agent Schaufelberger translated

the form for the defendant and he agreed to sign it. (Tr. at 28.) The defendant verbally acknowledged that he understood the form and he did not ask any questions about it. Agent Schaufelberger testified that there was no indication that the defendant did not understand what he was authorizing by signing the form. (Tr. at 28.) Agent Schaufelberger took three photographs of the defendant in his hospital bed. (Tr. at 28; Govt's Ex. 2.)

The next day, on June 19, 2002, the hospital called Agent Schaufelberger and informed her that the defendant was being released. (Tr. at 29.) Agent Schaufelberger went to the hospital to take the defendant into custody for an Immigration administrative arrest and to transport the defendant to the Immigration office in Grand Junction. (Tr. at 30.) While at the hospital, Agent Schaufelberger helped the nurses communicate with the defendant. She interpreted instructions about how to use crutches and translated the hospital discharge forms to the defendant. (Tr. at 29–31.) The defendant appeared to understand the instructions. (Tr. at 30–31.) He did not have any questions and he signed the discharge forms. (Tr. at 31; Govt's Ex. 4.) Agent Schaufelberger also helped the defendant get dressed and ready to leave the hospital. (Tr. at 30.)

Immigration Enforcement Officer Daniel Harry also went to the hospital and was responsible for transporting the defendant to the Immigration office in Grand Junction. (Tr. at 45–46.) To accommodate the defendant's injuries, Officer Henry made special arrangements for a more comfortable van and he made a special trip to obtain a wheelchair that was suitable for the defendant. (Tr. at 46.) Officer Henry helped the defendant get dressed and then helped him into the van. (Tr. at 46–47.)

.

Upon his release from the hospital, the defendant was taken to the Grand Junction Immigration office where he was processed for deportation proceedings. (Tr. at 32.) Agent Schaufelberger was responsible for "processing" the defendant and in so doing she administered several forms, translated into Spanish, to the defendant. (Tr. at 32.) Agent Schaufelberger testified that it is her common practice to ask the individuals she is processing whether they can read Spanish, and, if they can, to give the individual the forms and allow them to read them. (Tr. at 32–33.) She then asks the individual if they have any questions, and if they do, she answers them. (Tr. at 33.) Agent Schaufelberger testified that with regard to the "Request for Disposition" section of the I–826 form, she explains each of the three different options provided on the form, and tells them how to indicate which of the options they choose. (Tr. at 33.) Agent Schaufelberger followed these procedures with the defendant. She did not read the form to the defendant because he indicated he could read Spanish. (Tr. at 33–34; Govt's Ex. 3 at 5.)

The defendant was given the Notification of Rights and Request for Disposition form (a.k.a. Form I–826) first. (Tr. at 32.) Agent Schaufelberger reviewed with the defendant the middle section of the form, which advises of three options available to a deportable alien. (Tr. at 32; Govt's Ex. 3 at 5–6.) Agent Schaufelberger pointed to each of the three options on the form as she read, and then instructed the defendant to select one of the options by placing his initials on the line and putting an "X" in the corresponding box. (Tr. at 42.) The defendant chose the third option-to voluntarily return to Mexico. He placed his initials and an "X" next to that option and signed the form. (Tr. at 32–34; Govt's Ex. 3.) Agent Schaufelberger testified that the defendant appeared to understand what he was doing when he selected the third option and signed the form. (Tr. at 34.)

Agent Schaufelberger reviewed additional forms with the defendant which advised the defendant he was being placed in removal proceedings and explained his rights in those proceedings. (Tr. at 32–34; Govt's Ex. 3 at I–4.) Agent Schaufelberger testified that she places a copy of the form in front of the individual, "facing them, and then I go over each element of the form, each of the pages very carefully." (Tr. at 36.) After reviewing each element in these forms the defendant signed them in her presence. (Tr. at 36.)

During the entirety of the interactions with the defendant from June 16–19, 2002, the defendant never told Agent Schaufelberger that he was in excessive pain or that he did not understand what was happening. (Tr. at 36–37.) There was never any indication to Agent Schaufelberger that the defendant did not understand something or that he was mentally deficient in any respect. (Tr. at 37, 39–41.) Agent Schaufelberger testified that had she observed or become aware of any such deficiency, she would have stopped the process. (Tr. at 37–38.) Agent Schaufelberger testified that she never misled the defendant nor did she make any promises or threats to the defendant. (Tr. at 37.) In her opinion, the defendant appeared alert throughout the process and did not seem distraught. (Tr. at 37.)

After processing, Officer Henry transported the defendant to the nearby Mesa County Detention Facility. (Tr. at 46.) Officer Henry observed that it was easier to get the defendant in and out of the van this time because the defendant was "able

to help himself more." (Tr. at 46–47.) The defendant never verbalized that he was in any pain, although he "kind of winced once or twice" moving back and forth from the chair and car. (Tr. at 47.) Officer Henry notified the detention facility prior to their arrival that he was bringing someone who had just been released from the hospital. Upon arrival, a nurse met Officer Henry and the defendant in order to determine whether the defendant had any special needs and to ensure that the facility had the ability to take care of him. (Tr. at 47–48.)

The following day, on June 20, 2002, Officer Henry returned to the Mesa County Detention Facility to transport the defendant to a location just outside of Moab, Utah, where the defendant was to be transferred over to Immigration Detention Enforcement Officer Bernard Sullivan who would finish transporting the defendant to a detention center in Ignacio, Colorado. (Tr. at 48.) The transport from the detention facility to the designated location outside of Moab lasted approximately two hours. (Tr. at 48.) Officer Sullivan met Officer Henry at the designated location, took possession of the defendant's file, personal property, and medications, and then assisted the defendant into his vehicle. (Tr. at 52–53.) Officer Sullivan observed that the defendant seemed to be doing quite well given what he had been through and that he did not appear to be in any pain. (Tr. at 53.) Officer Sullivan transported the defendant for approximately another two hours to the Southern Ute Detention Center in Ignacio, Colorado. (Tr. at 54.) The defendant would have been fed and allowed to go to the bathroom during his transportation to Ignacio. (Tr. at 49, 53–54.) Upon arrival at the detention center, a wheelchair was provided for the defendant. However, he chose to use his crutches/walker instead. (Tr. at 54.)

The defendant spent the night at the Southern Ute Detention Center. (Tr. at 54.) The next morning, on June 21, 2002, Registered Nurse Tina Brown–Flockhart reviewed the St. Mary's Hospital records. The records showed that the defendant had been treated for a broken leg, but that he did not have any head injuries. (Tr. at 65, 67; Govt's Ex. 4.) She also reviewed and confirmed medical records concerning the defendant's pain medication. (Tr. at 65–70.) Review of those records indicated that the defendant had not taken any pain medication since leaving the Mesa County facility the previous day. Because the effects of the prescribed pain medication last only four to six hours, the defendant could not have been under the influence of pain medication that morning. (Tr. at 68–70.)

After reviewing the medical records, Nurse Brown–Flockhart gave the defendant a medical screening and examination. (Tr. at 70–80; Govt's Ex. 6 at 1.) She used a native Spanish-speaking sergeant at the detention center as an interpreter during the examination. (Tr. at 71.) As part of the medical screening, Nurse Brown–Flockhart asked numerous questions about the defendant's health history. Nurse Brown–Flockhart testified that there was nothing to indicate that the defendant did not understand the questions. (Tr. at 74.) The defendant demonstrated he understood the questions by providing appropriate answers. (Tr. at 70–77; Govt's Ex. 6 at 1.) The only medical question that appeared to confuse the defendant was the question about AIDS. However, after the question was explained more fully, the defendant "definitely" understood. (Tr. at 74.) According to Nurse Brown–Flockhart, the defendant did not appear to be in

any discomfort and there was no swelling on his repaired leg. (Tr. at 73.) The nurse conducted routine tests and confirmed the defendant did not have a head injury. (Tr. at 77–78.) The nurse concluded that the defendant was alert and oriented. (Tr. at 78.)

The defendant remained in the Southern Ute Detention Center from June 20 to June 25, 2002. Special accommodations were provided during that time. The defendant was provided with crutches and a wheelchair. He was housed in the cell closest to the booking desk where there was always an officer on duty who could provide assistance if needed. (Tr. at 82.) The defendant repeatedly indicated that he was not in much pain. (Tr. at 81.) He took only two pain pills while at the Southern Ute Detention Center. These pills were taken on June 22 and June 23, 2002, after he had made all the statements at issue in this case. (Tr. at 81; Govt's Ex. 6 at 2.)

The medical screening and exam concluded at approximately 10:00 a.m. on June 21, 2002. (Tr. at 78–80; Govt's Ex. 6 at 1.) Thereafter, Officer Sullivan transported the defendant to the nearby Durango, Colorado Immigration office where he was to be interviewed by Immigration Special Agent Pete Grijalva about possible involvement with criminal immigration offenses. (Tr. at 55.)

Upon arriving at the Durango office, the defendant was taken into an interview room. The interview room is approximately 12-by-12, with a table and two chairs on either side. (Tr. at 55.) For most of the interview Agent Grijalva was alone in the room with the defendant. However, Officer Sullivan was present for the first five minutes or so when the defendant waived his *Miranda* rights, (Tr. at 56, 103; Govt's Ex. 7), and Immigration Special Agent Warren Long was present when the defendant waived his right to retain the witnesses. (Tr. at 121–22; Govt's Ex. 8.) The interview room has a large plexiglass window that looks on to the hallway and then through another plexiglass window into a holding cell. (Tr. at 56.) The interior of the interview room is clearly visible from the holding cell and the hallway. (Tr. at 55, 95.) The day of defendant's interview was a busy day at the office with people frequenting the hallway. (Tr. at 61, 103.) Officer Sullivan passed the interview room approximately twelve times while the defendant was being interviewed for the purpose of keeping a close eye on the defendant. (Tr. at 61.) Officer Sullivan did not see anything unusual during Agent Grijalva's interview of the defendant. (Tr. at 57.) The door to the interview room remained open during the defendant's entire interview. (Tr. at 103.)

Agent Pete Grijalva has been employed by Immigration for over twenty years and has handled thousands of cases. (Tr. at 88.) Since approximately 1999, Agent Grijalva has been an Immigration criminal investigator, specifically responsible for targeting "ring leaders" of alien smuggling and smuggling organizations, as well as traffic fatalities during alien smuggling. (Tr. at 89.) Agent Grijalva speaks excellent Spanish. (Tr. at 95.)

Prior to his interview of the defendant, Agent Grijalva interviewed the three passengers in defendant's car who survived the accident and he reviewed the accident report. In addition, prior to the interview Agent Grijalva ascertained that the defendant was not in any pain. Agent Grijalva did this by directly asking the defendant about his condition, asking Officer Sullivan

about the defendant's condition and carefully observing the defendant. (Tr. at 103–04.) Agent Grijalva testified that he would not have conducted the interview if the defendant had been in a lot of pain. (Tr. at 104.) Agent Grijalva ensured that the defendant did not need to go to the bathroom, that he was not hungry, and that he did not need any medications. Agent Grijalva recalled that the defendant asked for a soda and Agent Grijalva bought a soda for him. (Tr. at 105.) Agent Grijalva was not dressed in any kind of uniform. (Tr. at 106.) Agent Grijalva introduced himself to the defendant as a "criminal investigator that investigates criminal matters concerning the immigration laws." (Tr. at 106.)

Immediately prior to questioning the defendant, Agent Grijalva gave the defendant his *Miranda* rights. He used Form I–214, which contains an English statement of the *Miranda* rights as well as the official Spanish translation for the United States government. (Tr. at 108; Govt's Ex. 7.) Agent Grijalva began by reading the top portion of the form-the part listing the *Miranda* rights-to the defendant in Spanish. (Tr. at 108–10; Govt's Ex. 7.) The defendant did not appear to be confused about what was being read to him. (Tr. at 110.) Agent Grijalva asked the defendant if he understood the paragraph and the defendant said he did. (Tr. at 109.) Agent Grijalva asked the defendant if he had any questions and the defendant said he did not. (Tr. at 109–10.)

Next, Agent Grijalva read in Spanish the next line that reads in English: "I have read (or have had read to me) this statement of my rights and I understand what my rights are." (Tr. at 110; Govt's Ex. 7 at 2.) Agent Grijalva explained to the defendant that he did not have to sign the form, that he would not be punished if he did not sign the form, and that his signature would show that he understood his rights. The defendant responded by saying he would sign. (Tr. at 110.) At that point, the defendant signed the first part of the form and Agent Grijalva and Officer Sullivan signed it as witnesses. (Tr. at 110; Govt's Ex. 7.) The form indicates it was signed at noon on June 21, 2002, just two hours after his medical examination. (Tr. at 111; Govt's Ex. 7.) The defendant did not have any questions at that time.

Agent Grijalva then read to the defendant in Spanish the second part of Form I–214, which pertains to the waiver of *Miranda* rights. (Tr. at 111.) Agent Grijalva carefully explained what the waiver meant. At that point, the defendant said he would sign the waiver and he signed the second portion of the form. (Tr. at 111–12; Govt's Ex. 7.) Had the defendant given any indication that he did not understand the waiver, Agent Grijalva would have stopped the interview. (Tr. at 111.)

Agent Grijalva testified that when he gives a defendant their *Miranda* rights, he carefully observes the person to ensure there is adequate understanding. If there is any indication that *Miranda* is not understood, the person is not interviewed. (Tr. at 106–07.) Agent Grijalva testified that if there is any sign of confusion or lack of understanding, he is careful to use language the person will understand. (Tr. at 114–15.)

After the defendant waived his *Miranda* rights, Agent Grijalva began the interview by asking the defendant specific questions about the case. Agent Grijalva testified that one of the first questions he usually asks in cases such as this is when the person last entered the United States. (Tr. at 113.) Based on his experience,

which indicates that illegal aliens typically go to and from the United States, Agent Grijalva confronted the defendant, expressing doubt as to defendant's claim that the most recent time he entered the United States was in 1997. (Tr. at 113–14.) The defendant then admitted that he most recently reentered the United States in 2002 and that he did so illegally. (Tr. at 115.) The defendant said he had been living in Phoenix but he did not know his address. (Tr. at 115–16.) The defendant admitted he was driving at the time of the accident, but claimed that the other car caused the accident by drifting into his lane. (Tr. at 116–17.) The defendant maintained that the accident was not his fault even after Agent Grijalva confronted him with the accident report which concluded that the defendant caused the accident by crossing into the lane of oncoming traffic. (Tr. at 117.)

The defendant stated that the passengers in his car were friends from his home town in Mexico and that the car belonged to his uncle Ricardo Aranda. (Tr. at 117–18.) The defendant claimed that he did not know how his passengers got to Phoenix, that the passengers called him and asked him to give them a ride to their destination, and that he did not charge them for the trip. (Tr. at 118–19.) [4]

Based on his experience, his investigation to that point, and the defendant's demeanor and body language, Agent Grijalva believed that the defendant was not telling the truth. (Tr. at 119–20.) Agent Grijalva explained to the defendant that this was a serious matter, that he knew from his experience "how things happened," and that he believed the defendant was being untruthful. (Tr. at 119.) At that point, the defendant became contemplative and changed his body language. (Tr. at 122–23.) Agent Grijalva testified that the defendant said something akin to "can I tell you the truth?" and Agent Grijalva responded that he could, but that it would have to be the complete truth. (Tr. at 122–23.) Agent Grijalva testified that if the defendant had maintained his original story-the story Agent Grijalva believed was untrue-he would have stopped the interview and sought guidance from the U.S. Attorney's office. (Tr. at 155.)

The defendant then talked freely, providing more of a summary report rather than answers in response to direct questioning. (Tr. at 112–13, 123.) The defendant told Agent Grijalva that he was actually hired to drive the passengers to a destination back East. He explained that his uncle Ricardo Aranda contacted him and said that these people from their small town had been smuggled into the United States by a man named Oaxaqueno. The defendant said his uncle arranged with Oaxaqueno for the defendant to drive the group of four to their destination on the East coast. (Tr. at 123–24.) Each passenger was charged $700 for the trip. The defendant was instructed to collect $1,400 when they reached their destination and

---

4. At this point in the interview, Agent Grijalva remembered that a determination had to be made as to what should be done with the passenger-witnesses. (Tr. at 121.) Agent Grijalva reviewed with the defendant whether he was willing to waive his right to have the witnesses retained. Agent Grijalva testified that "one of the witnesses needed follow-up medical care, so we were wanting to release her, but in that she was a potential witness in a criminal investigation, we couldn't release her without the approval of [the defendant.]" (Tr. at 121.) Agent Long was present when Agent Grijalva read the "release of witnesses" form to the defendant and the defendant signed the form. The defendant acknowledged he understood the form. (Tr. at 120–22; Govt's Ex. 8.)

bring that money back to his uncle. The defendant understood that the group would pay the remaining $1,400 later. Eventually, the defendant was to be paid $700 to $800 for driving to the East coast and back. (Tr. at 123–25.)

This second version of events described by the defendant was consistent with Agent Grijalva's experience regarding the operations of smuggling operations. (Tr. at 131–32.) It was also more consistent with information provided by the surviving passengers. (Tr. at 132.)

At this point in the interview, because they had talked for a long time, Agent Grijalva asked the defendant if he needed anything. (Tr. at 129.) The defendant asked if he could talk to his father. (Tr. at 129.) Agent Grijalva and the defendant walked to the processing area and called the defendant's father on speaker phone. When the father answered the telephone, Agent Grijalva identified himself and explained that the defendant was next to him and could hear what was being said. (Tr. at 130.) The defendant and the defendant's father began speaking with each other over the speaker phone and Agent Grijalva could hear what was being said. (Tr. at 130.)

Agent Grijalva terminated the interview after the telephone call. The defendant said that he just wanted to go back to Mexico. (Tr. at 132.) Agent Grijalva explained that the administrative portion of the case would not be addressed until the criminal investigation was completed. (Tr. at 132–33.) He also told the defendant he was sorry. (Tr. at 133.)

During the entire time Agent Grijalva interacted with the defendant, the defendant never indicated that he was in any pain and he never appeared to be con-fused. (Tr. at 133.) Agent Grijalva testified that the defendant appeared to be "very street-wise." (Tr. at 133.) Agent Grijalva never yelled at, threatened, or misled the defendant, nor did he promise the defendant anything. (Tr. at 133–34.)

Approximately two months after the accident, defense counsel hired Dr. Juan Mejia to evaluate the defendant. Dr. Mejia states in his report that he was hired for the express purpose of assessing the defendant's cognitive abilities and "the possibility that [the defendant] may not have the capacity to understand his *Miranda* rights." (Def's Ex. A at 1.) To test the defendant's intellectual functioning, Dr. Mejia conducted several tests using the Spanish language version of the Woodcock Johnson Psychological battery. (Tr. at 159.) The Woodcock Johnson is used to determine a person's level of literacy and tests the person's ability to read, write and do arithmetic. (Tr. at 160.) Dr. Mejia did not administer an IQ test. When asked why he did not, Dr. Mejia stated that because the referral had to do with understanding *Miranda* rights, he thought the Woodcock Johnson test would reveal more about the defendant's literacy and the defendant's understanding of the *Miranda* form. (Tr. at 161.)

Dr. Mejia administered the entire Woodcock Johnson Psychological battery. (Tr. at 160.) On the "broad cognitive ability" section, which tests general intellectual functioning, the defendant performed at an equivalency of 8.9 years and a grade level of 3.6. (Tr. at 160.) On the "oral language" section, which tests verbal ability, the defendant performed at an age equivalency of 8.9 years and a third grade level. (Tr. at 160.) Dr. Mejia testified that in talking with the defendant he detected "receptive and expressive deficits" in the de-

fendant's verbal ability. (Tr. at 161.) On the "reading cluster" section, the defendant demonstrated his "strongest performance," performing at an age equivalency of 10.6 years and a grade level of 4.7. (Tr. at 162.)

The overall conclusion reached by Dr. Mejia was that the defendant's intellectual functioning was in the range of mild mental retardation. (Tr. at 166.) Dr. Mejia stated that in his opinion a person below the sixth grade level for vocabulary and comprehension ability does not have the capacity to understand *Miranda*, and that it might actually take a higher grade level for somebody to understand *Miranda* in Spanish. (Tr. at 169–70.) Dr. Mejia concluded that in his opinion the defendant did not have the intellectual capacity to understand *Miranda*. (Def's Ex. 1 at 6.)

Dr. Mejia asked the defendant if he had been read his *Miranda* rights. The defendant said he had and that he understood them. (Tr. at 165; Def's Ex. 1 at 3.) During his assessment of the defendant, Dr. Mejia read the *Miranda* rights to the defendant and then asked him to explain the rights in his own words. In his report, Dr. Mejia states that the defendant said he "could not" because it was "difficult for him to do so." (Def's Ex. 1 at 3.) Dr. Mejia testified that the defendant's inability to explain the rights in his own words was consistent with the defendant's poor expressive abilities. (Tr. at 165.) Dr. Mejia asked the defendant for the meaning of each clause. (Tr. at 165.) In some instances the defendant "showed a fairly good understanding," but in other instances the defendant could not express what had been read. The defendant's inability to express the meaning of certain clauses caused Dr. Mejia to conclude that "as a whole, I don't think he understood what I read to him." (Tr. at 165.)

When asked whether the defendant understood specific rights contained in *Miranda*, Dr. Mejia stated: "He told me that he understood that the state could get him an attorney and that the attorney then would be able to represent him. That he had a clear understanding about that." (Tr. at 174.) Additionally, Dr. Mejia said that the defendant "understood that he could talk to his attorney. He understood that if he did not want to say anything, he could stop talking." (Tr. at 175.) However, Dr. Mejia stated that the defendant had difficulty understanding that anything he said could be used as evidence against him in a court of law. Dr. Mejia suggested that the defendant's inability to express an understanding of this right may have been at least partially due to confusing translation or wording. (Tr. at 170, 178.) Dr. Mejia testified:

> For example, court of law is translated to *juzgado de leyes*, which actually doesn't exist. *Juzgado*, yes, but *Juzgado de leyes* is just a direct translation. And if you add to that the part that speaks to administrative hearings and immigration hearings, it makes it even more confusing. So I think-and that's one area where he just couldn't explain to me that what he was saying could be used against him in a court of law.

(Tr. at 170.) Dr. Mejia testified that the translation of the first part of the right-"anything you say can be used against you"-was generally accurate, (Tr. at 176; Govt's Ex. 7 at 2), but he did not assess the defendant's understanding of that concept standing alone, absent the confusing "in a court of law" language. (Tr. at 178–79.)

Although the defendant "explicitly" told Dr. Mejia several times, in different interviews, that he could understand his *Mi-*

*randa* rights," (Tr. at 174; Def's Ex. 1 at 5), Dr. Mejia discounted the defendant's claim. Dr. Mejia explained: "there are some individuals who are aware of what their deficits are, and there are other individuals who don't. And in [the defendant's] case he is more of the latter, meaning that if he's told something, rather than saying I don't understand it, he would more likely to maybe believe that he did understand when, in fact, he wasn't understanding it." (Tr. at 166.)

## DISCUSSION

On June 26, 2002, the Grand Jury returned an Indictment charging the defendant with transporting undocumented aliens for financial gain resulting in death pursuant to various sections of 8 U.S.C. § 1324. Thereafter, the defendant filed the present motion to suppress, claiming that the statements he made to law enforcement agents (including immigration officials) should be suppressed on the grounds that they were involuntary and obtained in violation of *Miranda*. (Def's Motion to Suppress at 1; Def's Mem. in Support at 11, 13.) The government has indicated that it intends to introduce into evidence two groups of statements which fall within the defendant's motion: (1) the government intends to introduce statements made to Agent Schaufelberger on June 17, 2002; and (2) the government intends to introduce statements made to Agent Grijalva on June 21, 2002.

## I. *VOLUNTARY*

To be admissible, a statement or confession made by a defendant to law enforcement officers must be voluntary. The government has the burden of establishing by a preponderance of the evidence that the statements were voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996). A defendant's confession is involuntary if the government's conduct causes the defendant's will to be overborne and "his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

A court will consider a number of factors in assessing the totality of the circumstances surrounding the questioning, including "both the characteristics of the accused and the details of the interrogation." *Id.* at 226, 93 S.Ct. 2041; *see also United States v. Roman–Zarate*, 115 F.3d 778, 783 (10th Cir.1997). Relevant to this issue are, among other things, the age, education and intelligence of the accused, and the conduct of law enforcement officials, such as the length and location of the questioning and the use of punishment. *United States v. Muniz*, 1 F.3d 1018 (10th Cir.), *cert. denied*, 510 U.S. 1002, 114 S.Ct. 575, 126 L.Ed.2d 474 (1993).

However, while the mental condition of a confessant is relevant, it is not determinative. The Supreme Court has explicitly provided that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Relying on *Connelly*, the Tenth Circuit has consistently declined to find a confession involuntary, regardless of the unique physical or mental characteristics of a particular defendant, absent police conduct amounting to coercion, improper inducement or the exploitation of a known mental condition or defect. *See United States v. Erving L.*, 147 F.3d 1240 (10th Cir.1998)

(providing that "[defendant's] age, mental capacity, and personal idiosyncrasies are relevant only if this court first concludes that the officers' conduct was coercive," and concluding that given officers' courteous and non threatening behavior, the confession of a 13–year–old with a borderline IQ was voluntary); *United States v. Robertson,* 19 F.3d 1318 (10th Cir.) (concluding defendant's confession was voluntary even though it was given in the hospital after waking from a coma following a car accident), *cert. denied,* 513 U.S. 906, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994); *see also Nickel v. Hannigan,* 97 F.3d 403, 410 (10th Cir.1996) (holding that even in cases where a defendant is mentally impaired and the officer is aware of the impairment, a confession will be suppressed as involuntary only if the officer uses coercive measures to take advantage of the impairment), *cert. denied,* 520 U.S. 1106, 117 S.Ct. 1112, 137 L.Ed.2d 313 (1997); *United States v. Guerro,* 983 F.2d 1001 (10th Cir.1993) (concluding that inculpatory statement made by defendant after an invalid waiver of her Miranda rights was voluntary, and thus could be used for impeachment purposes, where there was no evidence of police overreaching through exploitation of defendant's weakness or other condition, even though defendant was unusually susceptible to suggestion and intimidation). With these principles in mind, the court considers the two groups of statements at issue in this case.

### A. *The June 17th Statements to Agent Schaufelberger*

■ Upon arriving at the hospital on June 17, 2002, and before approaching the defendant, Agent Schaufelberger asked the nurses about the defendant's condition and asked for permission to speak with the defendant. The nurses gave Agent Schau-felberger permission to speak with the defendant and also said that the defendant was willing to speak with her. Upon approaching the defendant, Agent Schaufelberger, who was not in uniform, explained that she was with Immigration and then she asked the defendant, personally, if he would be willing to speak with her. The defendant agreed to talk with her and never indicated at any time during their conversation that he did not want to talk with her. Agent Schaufelberger testified that she never misled the defendant nor did she make any promises or threats to the defendant. (Tr. at 37.)

Agent Schaufelberger, who has twenty-seven years of experience in immigration and has conducted numerous interviews, did not perceive any psychological, mental or other communication problems or impairments on behalf of the defendant. She inquired about his pain and he responded that he was "fine," and he did not show signs of distress. Agent Schaufelberger had been informed by the nurse that the defendant did not have a head injury and that he was not on any medications that would impair his mind. (Tr. at 14–15.) There was no indication that the defendant did not understand what was going on around him. Because there was absolutely nothing to indicate any weakness, there was nothing for Agent Schaufelberger to exploit.

Given these facts, and based on the totality of the circumstances, the court does not find any coercion, overreaching, or exploitation of a known defect by Agent Schaufelberger. Because "coercive police activity is a necessary predicate" to finding that a confession is involuntary, the court concludes that the defendant's statements to Agent Schaufelberger on June 17, 2002, were voluntary.

B. *The June 21st Statements to Agent Grijalva*

The circumstances leading up to the June 21, 2002 interview with Agent Grijalva reveal that the defendant was treated with great care and concern for his well being. Additionally, on June 21, 2002, prior to conducting his interview, Agent Grijalva made every effort to ascertain that the defendant was not in pain, and he ensured that the defendant was not hungry, did not need to use the bathroom, and that he did not need any medications.

Agent Grijalva, who has over twenty years of experience and has conducted thousands of interviews, testified that there was nothing to indicate that the defendant had a weakness or condition which would make him vulnerable to police questioning. Agent Grijalva attempted to thoroughly explain the defendant's rights and he carefully observed the defendant in order to ensure that the defendant understood. During the interview the defendant did not appear to be confused. Rather, Agent Grijalva testified that the defendant appeared "street-wise." In addition, the medical records revealed that the defendant was not under the influence of any pain medications and the defendant did not indicate that he was in pain during the interview.

The evidence relating to the tone of the interview indicates that it was cordial. Agent Grijalva accommodated all of the defendant's requests, including the purchase of a soda and the defendant's telephone call to his father. This cordial tone is further evidenced by Agent Grijalva telling the defendant "I'm sorry" at the conclusion of the interview. Agent Grijalva never yelled at, threatened, or misled the defendant, nor did he promise the defendant anything. (Tr. at 133–34.) Agent Grijalva was not dressed in uniform. The interview room was large, open to view through the large plexiglass window, and the door remained open during the entire interview.

Based upon these facts and the totality of the circumstances, the court fails to find any coercion, overreaching or exploitation of a known defect by Agent Grijalva. Because "coercive police activity is a necessary predicate" to finding that a confession is involuntary, the court concludes that the defendant's statements to Agent Grijalva on June 21, 2002, were voluntary.

## II. *MIRANDA*

 Separate from the issue of voluntariness is the application of the *Miranda* doctrine. *Miranda* requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation." *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Where the government claims the defendant waived these rights, the government bears the burden of showing the waiver of *Miranda* by a preponderance of the evidence. *Connelly,* 479 U.S. at 168, 107 S.Ct. 515.

As indicated, however, there are two requirements that must be met before *Miranda* applies: (1) the suspect must be in "custody," and (2) the questioning must meet the legal definition of "interrogation." *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993). The Supreme Court has instructed that a person has been taken into police custody whenever he has been "deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. "The only relevant inquiry is 'how a reasonable man in the suspect's position would have understood

the situation.'" *Perdue*, 8 F.3d at 1463 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

In other words, if the defendant in this case was subject to "custodial interrogation," even though his statements were voluntary, they cannot be used against him unless the government also shows that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *see Connelly*, 479 U.S. at 168, 107 S.Ct. 515.

With these principles in mind, the court turns its attention to the two groups of statements sought to be introduced by the government.

### A. *The June 17th Statements to Agent Schaufelberger*

■ After careful review, the court concludes that the defendant's June 17, 2002 statements to Agent Schaufelberger were not obtained as a result of a custodial interrogation, but rather were obtained during the course of a consensual encounter. Upon approaching the defendant in his hospital room, Agent Schaufelberger told the defendant she was with Immigration and asked the defendant if he would be willing to speak with her. The defendant agreed. Agent Schaufelberger was not in uniform. She did not threaten or mislead the defendant or make him any promises. The defendant was not taken into formal custody until two days later on June 19, 2002, well after the interview. Moreover, Agent Schaufelberger testified that the reason she did not give the defendant his *Miranda* rights was because the defendant was not in custody and because she was not focusing on the defendant as a

target of a criminal investigation. (Tr. at 20.)

There is no evidence before the court that would suggest that the circumstances of the encounter were so intimidating that a reasonable person in the defendant's shoes would have believed he was in custody or that he was being "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. Because the June 17, 2002, interview was non-custodial, *Miranda* was not required. Accordingly, the defendant's statements to Agent Schaufelberger on June 17, 2002 are admissible.

### B. *The June 21st Statements to Agent Grijalva*

The government concedes that Agent Grijalva interrogated the defendant while he was in custody. Therefore, the government must show that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights prior to Agent Grijalva's interview.

■ At the outset of this analysis, the court notes that the standard for voluntariness of a waiver is the same as the standard for voluntariness of a confession. *Colorado v. Connelly*, 479 U.S. 157, 169–70, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Amos*, 984 F.2d 1067, 1073 (10th Cir.1993). Having already concluded that the defendant's June 21, 2002 statements to Agent Grijalva were voluntary, the court similarly concludes that the defendant's *Miranda* waiver was voluntary. As explained more fully above, the record in this case is completely void of evidence suggesting that Agent Grijalva resorted to physical, psychological or emotional coercion in obtaining the defendant's statements or waiver of rights.

■ With regard to whether the defendant made a "knowing" and "intelligent" waiver, the court finds it significant that after a thorough reading and explanation of both his rights and the waiver form, the defendant signed the written waiver. "An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'" *United States v. Hack*, 782 F.2d 862, 866 (10th Cir.1986) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986). The facts reveal that before the interview began, Agent Grijalva read the defendant his *Miranda* rights in Spanish. The defendant did not appear to be confused while the rights were being read, he told Agent Grijalva that he understood what had just been read to him, and he said that he did not have any questions. Thereafter, Agent Grijalva expressly told the defendant that he did not have to sign the signature line indicating that he understood his rights, that he would not be punished if he did not sign it, and Agent Grijalva reiterated that his signature would show that he understood his rights. Agent Grijalva followed a similar approach in reading the "waiver" paragraph to the defendant. Agent Grijalva carefully explained what the waiver meant and at that point the defendant said he would sign the waiver.

The evidence indicates that in addition to the defendant's rights having being read and explained to him, extra precautions were taken to ensure that he was making a knowing and intelligent waiver. For example, prior to the defendant's signing of the waiver Agent Grijalva ascertained from various sources that the defendant was not in much pain. The hospital records documented that the defendant had not suffered a head injury and they further indicated that the defendant was not under the influence of pain medication at the time. Nothing indicated to Agent Grijalva-a highly experienced investigator-that the defendant was mentally impaired or that he did not understand his *Miranda* rights. Given the numerous precautions taken, the court finds that the defendant's verbal and written waivers of his *Miranda* rights constitute strong evidence of the validity of the waiver. *See Hack*, 782 F.2d at 866.

Moreover, although Dr. Mejia concluded that in his opinion the defendant did not have the intellectual capacity to understand *Miranda*, the court is mindful that "the Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).[5] "A defendant need not understand all the complexities of his fifth amendment right and the implications

---

5. Although Dr. Meija opined that the defendant was not capable of understanding Miranda, he used standards or "rules of thumb" that are not required by the law. For example, Dr. Meija stated that in his opinion a defendant must be able to articulate more than a basic understanding of Fifth Amendment rights. (Tr. at 175, 177, 178.) *But see Smith v. Zant*, 887 F.2d 1407, 1430 (11th Cir.1989) (providing that defendant need understand only the core of the fifth amendment

guarantee). Similarly, Dr. Meija testified that it is a rule of thumb among psychologists that any person who performs below the sixth grade level on certain tests cannot understand *Miranda*. (Tr. at 169–70.) *But see Rice v. Cooper*, 148 F.3d 747, 749 (7th Cir.1998) (finding valid *Miranda* waiver by 16–year–old, mildly retarded defendant, who initially stated he did not understand his rights and thereafter police explained them in simplest manner possible), *cert. denied*, 526 U.S. 1160, 119

of a decision to waive those rights. Rather, the defendant must understand only the core of the fifth amendment guarantee." *Smith v. Zant,* 887 F.2d 1407, 1430 (11th Cir.1989). The Supreme Court has indicated that a defendant's waiver is "knowingly and intelligently made" if the defendant "understood that he had the right to remain silent and that anything he said could be used as evidence against him." *Colorado v. Spring,* 479 U.S. at 574, 107 S.Ct. 851.

In this case, the defendant demonstrated that he had an understanding of these basic concepts. The testimony of Dr. Mejia revealed defendant's understanding of his right to remain silent and his right to have an attorney. Dr. Mejia testified that the defendant "understood the state could get him an attorney and that the attorney would then be able to represent him." (Tr. at 174.) Dr. Mejia further testified that the defendant "understood that he could talk to his attorney. He understood that if he did not want to say anything, he could stop talking." (Tr. at 174–75.)

Dr. Mejia's testimony did not, however, resolve whether the defendant understood the concept that anything he said could be used as evidence against him. More specifically, Dr. Mejia testified that the defendant had difficulty understanding that "anything he said could be used against him in a court of law." Dr. Mejia suggested, however, that the defendant's inability to express an understanding of this right may have been at least partially due to confusing translation or wording. (Tr. at 170, 178.) Dr. Mejia testified:

For example, court of law is translated to juzgado de leyes, which actually doesn't exist. Juzgado, yes, but Juzgado de leyes is just a direct translation. And if you add to that the part that speaks to administrative hearings and immigration hearings, it makes it even more confusing. So I think-and that's one area where he just couldn't explain to me that what he was saying could be used against him in a court of law.

(Tr. at 170.) Dr. Mejia testified that the translation of the first part of the right-"anything you say can be used against you"-was generally accurate. (Tr. at 176; Govt's Ex. 7 at 2.) However, he did not assess the defendant's understanding of this core concept, standing alone, without the confusing "juzgado de leyes" language and the language about immigration and administrative proceedings. Accordingly, Dr. Mejia was unable to answer whether the defendant understood the core concept that anything he said could be used against him.

Considering the totality of the circumstances and evidence in this case, the court is of the opinion that the defendant understood his right against self-incrimination. On June 19, prior to the interview in question, the defendant told Agent Schaufelberger that he could read Spanish and he had an opportunity to read and review his *Miranda* rights during his processing. Agent Schaufelberger testified that on June 19, the defendant appeared to understand *Miranda* and he did not have any questions. (Tr. at 32–36.) On the day in question, June 21, 2002, Agent Grijalva read the defendant his rights and the waiv-

S.Ct. 2052, 144 L.Ed.2d 218 (1999); *United States v. Male Juvenile,* 121 F.3d 34, 40 (2d Cir.1997) (finding valid *Miranda* waiver by juvenile with IQ of 71, second grade reading level, and Attention Deficit Disorder); *Moore*

*v. Dugger,* 856 F.2d 129, 132, 134–35 (11th Cir.1988) (finding valid *Miranda* waiver despite defendant's IQ of 62, intellectual level of an 11–year old, and classification as educable mentally handicapped).

er in Spanish, and the defendant said he understood and signed the forms. Neither Agent Grijalva nor Agent Schaufelberger, two very experienced immigration agents, had any indication that the defendant had significant mental deficiencies that would preclude him from making a valid waiver.

Moreover, the defendant's personal circumstances and background suggest that he was and is capable of understanding the rights set forth in *Miranda*. The defendant indicated that he has been working in the United States since 1997, that he was recently married and has a five-year-old daughter. (Def's Ex. 1 at 2.) Additionally, the defendant has been able to describe the circumstances of the case in a consistent manner, and he has used language and vocabulary which suggests he has the ability to understand his rights. For example, Dr. Mejia quotes the defendant as saying: "many people here are affected considerably by being locked up, not me;" and "I know I'm not a pollero [transporter of illegal immigrants]." The defendant also expressed concern that the surviving passengers would be "pressured" into "changing their opinions," but he believed "they will tell the truth" and state that he is not a "pollero." (Def's Ex. 1 at 3.) The defendant's use of complicated words and concepts, and his attempts to defend himself suggest that his mental functioning is at a level where he can understand the core concept of the Fifth Amendment.

Finally, and interestingly, the defendant has never claimed, at any point in time, that he did not understand his *Miranda* rights. To the contrary, the defendant has affirmatively stated several times and he continues to maintain that he understood his *Miranda* rights.

Based on the totality of the circumstances and evidence presented to the court, the court concludes that the government has met its burden of showing that the defendant made a voluntary, knowing and intelligent waiver of *Miranda*. Accordingly, the defendant's statements to Agent Grijalva on June 21, 2002, are admissible.

Therefore, based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that defendant's motion to suppress is DENIED.